# EXPERT REPORT OF BRUCE G. SILVERMAN

KEIRA MCCARRELL,

*individually and on behalf of all others similarly situated,*

*Plaintiff,*

*v.*

*RUGSUSA, LLC,*

*Defendant.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

Case No. 3:25-cv-00454-AB

*February 20, 2025*

**REDACTED VERSION**

SILVERMAN CONSULTING LLC
3168 DONA MEMA PLACE   STUDIO CITY CA 91604
TEL: 323-654-7659; MOBILE 310-200-7670
brucesilvermank&gmail.com
WWW.BRUCESILVERMANCONSULTING.COM

**CONTENTS**

I. Introduction ........................................................................................................ 2

II. Qualifications .................................................................................................... 8

III. Summary Of Opinions .................................................................................. 17

IV. Advertisements Featuring Price-Off Messages Play An Important Role In The Customer Purchase Decision Process .................................................................. 19

V. Consumers View Sales As Time-Limited Or Availability-Limited And This Plays An Important Role In Consumer Purchasing Decisions ............................................ 24

VI. Customers Are More Likely To Purchase An Item If They Think They Are Getting A Good Discount Off The Regular Price ................................................................. 30

VII. Defendant's "Sale" Claim Would Be Important To A Reasonable Consumer In Deciding Whether To Purchase One Or More Of Its Products ........................................ 35

VIII. It Is Probable That A Significant Portion Of  Defendant's General Consuming Public, Acting Reasonably In The Circumstances, Would Be Misled By Its Promotional Messaging .......................................................................................................... 37

IX. A Reasonable Customer Would Rely On The Veracity Of Defendant's Price-Off Messaging, i.e., That The Sale Price Is Truly Less Than The Regular Price ................... 39

X. It Is Unlikely That A Reasonable Consumer Would Access And Read The Disclaimer. And The Disclaimer Itself Is Deceptive To A Reasonable Consumer ............................ 41

EXHIBIT A .......................................................................................................... 46

EXHIBIT B .......................................................................................................... 55

EXHIBIT C .......................................................................................................... 73

## I. INTRODUCTION

1.        My name is Bruce G. Silverman. I am an advertising expert retained by Counsel for Plaintiff as an expert witness in connection with the matter styled *KEIRA MCCARRELL, individually and on behalf of all others similarly situated, Plaintiff, v. RUGSUSA, LLC, Defendant*, which is pending in the United States District Court, District of Oregon, Case No. 3:25-cv-00454-AB.

2.        According to Plaintiff's Class Action Complaint, "Defendant Rugs USA, LLC ("Defendant" or "Rugs USA") sells and markets rugs and home accessory products online through the Rugs USA brand and website, www.rugsusa.com."[1] On its website, Defendant advertises the Rugs USA rugs (the "Products") and their prices.  Consumers who visit the website can purchase the Products through an online store hosted on the website.

3.        Plaintiff alleges: "At any given time, on its website, Defendant advertises steep discounts on its Products. … And it advertises these discounts extensively: on an attention-grabbing banner near the top of its website; in a large banner image on its homepage; on the products listing pages; on the individual product pages for each Product, and on the checkout pages. It advertises them by touting 'X% off'; by advertising list prices in strikethrough font next to lower, purported discount prices; with slogans such as '20% Off' in attention-grabbing, red font next to product descriptions."[2]

4.        Plaintiff further alleges that far from being time-limited, "Defendant consistently, if not perpetually, offers purported reductions off the list prices it advertises.

---

[1] Complaint, ¶6
[2] *Id.*, ¶22.

As a result, everything about Defendant's price and purported discount advertising is false. The list prices Defendant advertises are not actually Defendant's regular or former prices for the Products Defendant sells because Defendant consistently makes its Products available for less than that on its website, and its customers did not have to formerly pay that amount to get those items. The purported discounts Defendant advertises are not the true discount the customer is receiving."[3]

5.     As discussed below, the evidence I have reviewed supports these allegations. Defendant's promotional calendars, transactional data, deposition testimony and historical website images demonstrate that Rugs USA consistently displays purported discounted pricing for its products on its website. And it does so in substantially the same manner. To begin, Rugs USA displays the prices for its rugs appearing on its home page and product pages with strikethrough pricing, displaying a reference price (which reasonable consumers would believe to be the price at which Rugs USA usually and typically sells that product) next to a purported discounted price. Rugs USA also sometimes further emphasizes the purported savings by showing the corresponding percentage off. But as detailed below, the strikethrough price is not the price at which Rugs USA usually and typically sells the product. Figure 1 below shows an exemplary product listing on Rugs USA's website:

---

[3] *Id.,* ¶30.



Maid Medallion Washable Rug | Red

$49.00 $79.00 (38% OFF)

***Figure 1. Screenshot from www.rugsusa.com
homepage, accessed February 16, 2026.***

6.      In addition to the strikethrough pricing, Defendant offers a constant stream

of further discounts, consistently running promotions that provide additional percentages

off or amounts off the price of its products. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ This  additional

discounting further lowers the price at which consumers typically and usually pay for the

---

[4] Hadian depo. tr. 61:1-62:5; 65:17-24.

Products on Rugs USA's website. Here are some of the prominently displayed banner ads showing such discounts.



*Figure 2. Screenshot captured July 8, 2024*
*(from Complaint, ¶24)*

5



*Figure 3. Various screenshots, as shown in
Complaint, ¶22.*

6

7.    I understand Plaintiff seeks to certify an Oregon class (the "Class") that includes customers who, since October 13, 2023, purchased one or more Rugs USA rugs (the "Rugs USA Products" or "Products") advertised at a discount from Defendant's website while in Oregon.

8.    I have been asked to:

(a)    Discuss how advertisements that represent a sale is ongoing (including advertisements that state items are "on sale" using "price-off" statements/promises such as "X% Off," "$X Off," or strikethrough prices displaying the purported regular price in strikethrough font next to a lower discount price) influence customer purchasing behaviors;

(b)    Discuss how the inclusion of "end dates," such as a seasonal or holiday theme for a sale in promotional messaging, representing that a sale has an end date influences consumer purchasing behaviors;

(c)    Opine as to whether Defendant's advertising of time-limited or limited-availability sales or discounts would be important to a reasonable consumer deciding whether to purchase Defendant's products;

(d)    Opine as to whether Defendant's advertisements implementing strikethrough-pricing, "X% Off" or "$X Off" discounts would likely mislead a significant portion of Defendant's general consuming public, acting reasonably in the circumstances; and

(e)    Opine on the "tool tip" asterisk and MSRP disclaimer that Defendant added to the strikethrough pricing appearing on the product pages on its website.

9.    My opinions in this action are based on my 50+ years of professional experience in the advertising industry as set forth in further detail below, as well as my review of the pleadings and other documents cited throughout this report and listed in

7

Exhibit A, which is hereto attached, samples of the accused ads, and various internet-sourced articles, which are specifically cited throughout the report.

10.     My compensation for expert witness services in this matter is $675 per hour for meetings, telephone conferences, document review, research and report preparation. My fee for appearances at depositions, arbitrations or trial is $6,750 per day. Additionally, I am to be compensated for the travel and preparation expenses associated with my work on this case. My compensation is in no way contingent on the opinions I reach or the outcome of the case.

## II. QUALIFICATIONS

11.     I am the owner and manager of Silverman Consulting LLC, an advertising and branding firm I founded in 2005 to provide advice and counsel to companies both in the U.S. and abroad engaged in marketing consumer goods and services. In addition, I have worked with law firms both as a consultant and as an expert witness on cases involving false and deceptive advertising, trademark infringement, branding, media, publicity rights and advertising industry custom and practice. I have testified as an expert in federal courts in Arizona, California, Delaware, Florida, Illinois and Oregon, in state courts in California and Missouri, at arbitrations, and before the Copyright Royalty Judges of the Library of Congress.

12.     Attached as Exhibit B is a copy of my *curriculum vitae.* Also attached is Exhibit C, a list of cases in which I have given sworn expert witness testimony during the past four years.

13.     My opinions are reflective of the accumulated knowledge and insights I have gained over the course of a 50+ year career working at the highest levels in the "real world" of marketing and advertising.

14.     After graduating with a Bachelor of Arts degree from Adelphi University (Garden City, New York) in 1966 and attending Albany (New York) Law School for one year, I began my advertising career at the Ogilvy & Mather agency ("O&M") in New York in mid-1967. During my more than 13 years at O&M I worked in the agency's offices in New York (twice), London, Houston and Los Angeles. During much of that period, I was able to work side-by-side with advertising legend David Ogilvy, the agency's founder and one of the three most important advertising figures of the 20th century.[5] Under Mr. Ogilvy's tutelage I became a copywriter, later a copy supervisor, eventually a creative director and finally, a member of the agency's Council of Directors and Senior Vice President/Executive Creative Director at the firm's flagship New York office. Executive Creative Director, or Chief Creative Officer as it is sometimes called, is the highest-ranking position in the creative department of an advertising agency.

15.     At that time, O&M was the fifth-largest advertising agency in the world, serving such clients as American Express, Avon, British Travel Association, Campbell Soup Company (Pepperidge Farm bakery products, Swanson frozen dinners, et al.), Cessna, General Foods (Maxwell House, Post Cereals, Country Time Lemonade, et al.),

---

[5] David Mackenzie Ogilvy CBE (23 June 1911-21 July 1999) was the founder of the global advertising firm Ogilvy & Mather. Mr. Ogilvy was made a Commander of the Order of the British Empire in 1967, elected to the U.S. Advertising Hall of Fame in 1977, and appointed to France's Order of Arts and Letters in 1990. He was the author of two of the most successful business books ever published, *Confessions of an Advertising Man* and *Ogilvy on Advertising*.

Hershey's, IBM, Lever Brothers (Dove soap, Imperial margarine, et al.), Mattel, Mercedes-Benz, Merrill Lynch, Nabisco (Chips Ahoy, Premium Saltine crackers, Oreo Double Stuf cookies, et al.), Panasonic, Shell, TWA and the United States Travel Service.

16.     I later held C-level positions (Chief Creative Officer/Chief Operating Officer) at two other global agencies, Bozell & Jacobs Southwest (1981-1983), whose clients included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay cosmetics, Pace Foods, Quaker Oats, Southwestern Bell and Zale Corporation, and BBDO/West (1984-1986), whose clients included Apple, Coldwell Banker, Dodge, Pepsi, Sizzler and the Union Bank of California. My responsibilities at those agencies included oversight of *all* client-service functions, including the account management and media departments, as well as the creative teams.

17.     I was co-owner, President and Chief Creative Officer of the Asher/Gould agency in Los Angeles from 1986 to 1997. The agency grew from $10 million to $160 million in annual billings during my tenure there, thus becoming one of the largest privately-owned advertising agencies in the country. Our clients included Avery Dennison (office products), Baskin-Robbins, the California Department of Health Services, HBO, MGM Grand Resorts, the Pabst Brewing Company, Pizza Hut, Sanyo (electronics), Sheraton hotels, Sun America (financial services) and Suzuki USA (cars and trucks).

18.     Although I started out on the creative side of the agency business, my long-term ambition was to run an agency, i.e., to become a CEO. To achieve that goal I needed to know as much about media as I did about the creative process. Media purchases generally account for 80-85 percent of most advertising budgets.

19.     That is why I made it my business to learn how media strategies are developed, how tactics are planned, and how television and radio time, magazine and

10

newspaper space, on-line, digital and social media and out-of-home ads (billboards, transit ads, bus shelter ads, etc.), are negotiated, purchased and stewarded.

20. In 1997 I was appointed President/CEO of the principal U.S. unit of Western International Media (later known as Initiative Media), then the largest ($22 billion in annual billings) advertising media planning and buying agency in the world.[6] During the five-year period I led the U.S. agency (1997-2002), we served more than 500 clients, including American Honda's Acura division, Albertson's, American Airlines, Bell South, Carl's Jr/Hardee's, Chevrolet, The Walt Disney Company, The Home Depot, Johnson & Johnson, Kroger's Ralphs and Fry's divisions, the Las Vegas Convention & Visitor's Authority, Safeway, Sav-On and Osco drug stores, Six Flags, Taco Bell, the United States Navy Recruiting Command and Unilever.

21. In 2003, longing to return to an entrepreneurial business environment, I joined Wong Doody, a top 100, privately-owned, full-service agency with offices in Seattle and Los Angeles, as a partner and President. The agency's clients included Alaska Airlines, Alpine Electronics, Autodesk (architectural and engineering software), Clif Bar, Inc., the Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, T-Mobile and the UCLA/Anderson School of Management.

22. As previously noted, I founded Silverman Consulting LLC in 2005. In addition to its consulting services, it has provided both creative and media services typically offered by advertising and media planning/buying agencies to a significant

---

[6] Initiative is now part of Omnicom Group, Inc., a leading global marketing and corporate communications holding company which provides services in advertising, CRM, public relations, media planning and buying, digital marketing and brand consulting for over 5,000 clients in 100 countries. (NYSE:OMC).

number of domestic and international clients, including two of the largest healthcare systems in America, a major university, multi-state retail chains, professional service providers, real estate developers and independent motion picture producers.

23. A list of clients I served during and after my advertising agency career is included in my CV (Exhibit B).

24. Hundreds of advertisements I created have been published in consumer and business magazines, newspapers, billboards, and on websites. I have also written and produced more than a thousand national, regional, and local television and radio commercials, many of which have been referenced in popular books about advertising or advertising textbooks written by leading academics.

25. Advertising practitioners are most typically recognized within the industry for the campaigns they helped create. I coined the tagline "Don't Leave Home Without It" for American Express, which it employed as its global slogan for nearly 20 years. (A variant of "Don't Leave Home…" was revived in 2021.) I helped American consumers rethink their opinion of Mercedes-Benz automobiles by advertising them as "Engineered Like No Other Car in the World." (At that time, advertising for American luxury cars such as Cadillac, Chrysler Imperial and Lincoln Continental focused almost entirely on styling; the bigger the tailfins the better!) My "Bullish on America" campaign helped transform Merrill Lynch's reputation from that of a big retail wire house into an innovative provider of a broad range of financial services and inspired its famous logo. My global "Shell Answer Man" campaign de-commoditized Shell gasoline, helping propel the company to market leadership in the United States for more than a decade. I also created the advertising campaign that ridiculed a salsa made in "Nooo Yawk Ciddy," which resulted in Pace Picante Sauce, then marketed by a tiny company in San Antonio, becoming

one of America's best-selling condiments. I am particularly proud of the role I played in the strategic development and implementation of the State of California's ground-breaking tobacco-use prevention marketing campaign. It is credited with saving hundreds of thousands of lives and more than a half-trillion dollars in healthcare costs.[7] It became the prototype for the many state-sponsored tobacco-use prevention campaigns that were implemented throughout the country in the 1990's.

26.    In addition to creating and producing ads, as a creative director I was also responsible for guiding and approving the work of the many hundreds of copywriters, art directors and producers who, over the years, reported to me. There was only one way for me to be effective in that role: I had to become a true student of advertising. Tens and sometimes hundreds of millions of dollars were at stake each time I approved an ad. Media time and space is always costly, sometimes extraordinarily so, e.g., the network price for a single thirty-second commercial in the 2026 Super Bowl game ranged from $8 to $10 million, plus whatever it cost the advertiser to produce the spot. And from a practical standpoint, if a costly campaign fails to generate the revenue it was projected to deliver, odds are the agency will be fired. Advertising is a "what have you done for us lately" business.

27.    In my experience most successful consumer advertising practitioners know a lot about how to create ads that *engage* consumers. But engaging is not *selling*. In my experience, that requires a deep understanding of consumer purchasing behavior,

---

[7] James Lightwood, et al., *Health Care Cost Saving Attributable to the California Tobacco Control Program, 1989 to 2018 (Final Report)*, Department of Clinical Pharmacy, Sch. of Pharmacy, Univ. of Cal, San Francisco (Jul. 26, 2020), available at https://escholarship.org/uc/item/53b9b8fz, accessed 2/16/2026.

beginning with how people learn about a product, what they come to understand and appreciate about its brand, and finally, what factors ultimately lead them to deciding to purchase it.

28.     That is why in addition to deriving useful information from the thousands of proprietary quantitative marketing and advertising studies I reviewed over the years, I estimate that between 1970 and 2020 I personally interviewed more than 5,000 consumers about advertising and branding issues for products and services ranging from business jets to ice cream cones. I have observed at least 3,500 focus group sessions as well, including sessions devoted entirely to discussing with consumers what they knew and felt about price promotions. Every study I reviewed, every focus group I attended, every one-on-one interview I conducted, and of course, what I learned every day on the job as a working advertising and branding professional cumulatively informed my knowledge of how consumers interact with advertising, including messaging promoting limited-time price-off deals.

29.     As listed in my CV (Exhibit B of this report), many of my former clients were retailers. These included supermarket and drug store chains, big box stores, women and men's fashion retailers, department stores, jewelry store chains and even stores that sold carpets and rugs. Promotional messaging regarding sales and discounts was an essential part of the marketing communications mix for every one of these clients. I have also worked with some of the largest automotive dealer associations in America, all of which frequently promoted limited-time pricing for some or all of their models. Every grocery product marketer I ever worked with periodically promised consumers price-off deals via couponing and in-store messaging. Clients that advertised heavily on television nearly always made their discount or other promotional messaging a key component of

14

their media buys. My quick-service restaurant clients (which most consumers refer to as "fast food" outlets) frequently offered consumers price-off deals, or two-for-one deals, or all-you-can-eat deals via television to spur visitation. My airline clients often advertised limited-time deals, especially for their most highly competitive city pairs. My one and only major league baseball team client sometimes advertised BOGO ("Buy One/Get One" for free) deals for Dodger Dogs, though only when the upcoming series was with a cellar-dwelling (or close to the cellar) visiting team. (It is amazing how a free hot dog can sometimes rack up sales of thousands of tickets, even for pricey box seats!) Nearly all of my clients (since the early 2000's) advertise and often offer discount pricing for their products and services on the web as well.

30.    I have been the recipient of virtually every significant award for advertising effectiveness and creativity offered by the advertising industry, including twice winning a Gold Lion at the Cannes International Advertising Festival, the "Oscar" of the advertising business. I have also been the recipient of three American Marketing Association "Effie" awards, which recognizes campaigns that are most effective at driving sales. Initiative was twice named Media Planning and Buying Agency of the Year by the industry's leading trade publication, *Advertising Age*, during my tenure there.

31.    I served on the Board of Directors of the American Association of Advertising Agencies (the principal trade association of the advertising industry) and on the boards of the Los Angeles Advertising Agency Association, the Dallas Advertising Club and the Houston Advertising Federation. I was also a long-standing member of the commercials peer group of The Television Academy (the "Emmys" organization).

32.    I have taught advertising at Pepperdine University and the University of California, Los Angeles (UCLA) Extension, where I also served for five years as a member

15

of the Dean's Board of Advisors. In addition, I have guest-lectured on advertising at many of America's top colleges and universities, including Arizona State, NYU, Rice, SMU, Stanford, the University of Arizona, the University of California (Berkeley), the University of Houston, the UCLA Anderson School of Management, the UCLA Fielding School of Public Health, the University of Southern California, the University of Texas and the Thunderbird School of Management.

33.    I have been interviewed by *The New York Times*, *The Chicago Tribune, The Los Angeles Times, The Washington Post, The Wall Street Journal*, *The New Yorker* and many other newspapers and magazines, as well as by on-air personalities at television and radio networks and stations, about issues involving advertising, branding and media.

34.    My expert testimony and my process for evaluating advertising messages was accepted by both the Honorable Lucy H. Koh and the Honorable William H. Orrick as evidence of materiality in their decisions certifying classes in two cases involving advertising claims, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018), and *Debbie Krommenhock, et al., v. Post Foods, LLC*, 334 F.R.D. 552, 565-66, 579-80, 587 (N.D. Cal. 2020), as well as by the Honorable Virginia M. Kendall in *Zarinebaf v. Champion Petfoods USA, Inc.*, No. 18 C 6951, 2022 U.S. Dist. LEXIS 56603, at \*17-23 (N.D. Ill. Mar. 29, 2022). In addition, my opinions have been held as relevant in deciding class certification and summary judgment. Judge Orrick noted that my advertising opinions were "relevant and helpful" for claims in a case concerning marketing of a premium-priced dog food that did not disclose the risk of heavy metals. *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 683 (N.D. Cal. 2021). Judge David O. Carter found my expert knowledge in the field of advertising to be helpful for the trier of fact to understand the impact a label claim would have on consumers. *Mier v. CVS Pharmacy, Inc., et al.,* No. 20-cv-01979, 2022 U.S.

16

Dist. LEXIS 96082, at *14 (C.D. Cal. May 9, 2022), *rev'd on other grounds sub nom.*, *Mier v. CVS Health*, No. 22-55665, 2023 WL 4837851 (9th Cir. July 28, 2023). And the United States Court of Appeals for the 9th Circuit affirmed the district court's grant of class certification in *Lytle v. Nutramax Laboratories, Inc.* 99 F.4th 557 (9th Cir. April 22, 2024), noting that plaintiff relied upon my expert report to establish that a reasonable consumer would have found the marketing messaging on the Nutramax product label misleading.

### III. SUMMARY OF OPINIONS

35.     Representations that items are on sale or that discounts are available play an important role in the customer purchase decision process for virtually all products and services sold online as well as at brick-and-mortar retail outlets.

36.     The perception that sales and discounts are limited in time and availability also plays an important role in consumer purchase decisions, as explained in detail below.

37.     In my opinion, Defendant's advertising of sales and discounts, as described in Plaintiff's Complaint and as demonstrated in documents I have reviewed which include Defendant's website, promotional calendars, pricing information, deposition testimony and deposition exhibits, would be important to a reasonable consumer in deciding whether to purchase one or more of Defendant's products.

38.     Based on the evidence I have reviewed concerning Defendant's sales practices, it is my opinion that a significant portion of Defendant's online customers, acting reasonably in the circumstances, would be misled.

39.     In particular, in my opinion a reasonable consumer receiving a purported discount would understand that the promotional messaging on Defendant's website conveys that the "list" prices (also referred to as a reference price or strikethrough price)

17

featured on Defendant's website are the prices that Defendant usually and typically charges consumers to buy its products. Further, reasonable consumers would understand Defendant's promotional messaging to mean that they could receive a discount off of those usual and typical prices and therefore pay prices lower than the usual and typical prices (i.e., discounted prices) by purchasing subject to a sale or discount offered to them. However, as the evidence discussed in greater detail below shows, these prices were not Defendant's usual and typical prices. Also, as the evidence shows, further discounts were routinely available to Defendant's customers during the relevant timeframe through promotions offering additional savings (e.g., another "X% Off" the already discounted prices). The majority of customers who purchased during the relevant timeframe paid prices discounted well below the advertised "list" prices for Defendant's product. In other words, reasonable consumers would believe, based on Defendant's advertisements and price quotes, that they are getting a real discount, when they are not.

40.    In my opinion, a reasonable consumer would rely on the veracity of Defendant's messaging, i.e., that Defendant's "discount" prices for its products are truly less than Defendant's regular and typical prices for the products. A reasonable consumer would believe that the "list" price is truly Rugs USA's regular price which consumers typically have to pay and typically do pay for its products, and that they are receiving the advertised discount from the regular prices when purchasing products at the advertised discounted prices.

41.    My rationales for these opinions follow.

18

## IV. ADVERTISEMENTS FEATURING PRICE-OFF MESSAGES PLAY AN IMPORTANT ROLE IN THE CUSTOMER PURCHASE DECISION PROCESS

42.     There are myriad reasons companies and other entities invest their hard-won dollars in advertising. Some companies use advertising to help define their brand or to increase brand awareness. Political candidates often use advertising to promote their candidacy or to attack a candidate from the opposing party. Social marketers, which often include government entities and not-for-profit organizations, sometimes use advertising to discourage the use of tobacco or illegal drugs or other anti-social behavior. But by far, most consumer marketers rely on advertising to help promote their products or the services they offer. Simply put, it is to *sell*.

43.     But there is a big difference between brand advertising, which is the method marketers use to distinguish and add value to their products, and promotional advertising, which offers consumers a discount (e.g., a "Sale" price) or some other type of limited-time or limited-availability incentive. Both are valid ways to market products if used appropriately.

44.     I spent many years in the advertising agency business helping promote products sold at supermarkets such as breakfast cereal, coffee, frozen dinners, dog food, soda, beer, salsa, cookies, hot dogs, snacks, candy, energy bars, and soap. Nearly every campaign I worked on for those clients relied on television to help define the brand, while retailer print ads and fliers, online messaging, and point-of-sale ads that offered a limited-time discounted price for a product were used to generate short-term sales increases.

19

45.    For example, my "Not Made in Noo Yawk Ciddy" television campaign for Pace Picante Sauce was strategically focused on a core brand value of *authenticity*. Almost every Pace commercial included a variant of this line: "Pace is made with real herbs and spices in San Antonio by people who know what



*Figure 4. Screenshot from 1981 Pace Picante commercial*

Picante sauce is supposed to taste like." "Authenticity" differentiated Pace from other salsa brands in the minds of consumers, an attribute they saw as beneficial.

46.    We probably considered more than a dozen different ways to engage the attention of television viewers for our Pace Picante campaign before settling on a creative strategy that parodied the "slice of life" format that had been a staple of packaged goods advertising for decades. But instead of a harried mom serving dinner in the family's dining room, we replaced dad and the kids with a bunch of cowboys taking their dinner break near a chuckwagon somewhere out on the prairie. Instead of "mom" taking the family's barbs for serving a less than wonderful meatloaf, we featured "Cookie," a grizzled veteran of the plains, who tried to get away with serving the boys "Brand X" salsa (made in "Noo Yawk Ciddy," no less) instead of Pace, the salsa "…made in San Antonio…."

20

47.     Consumers responded very well to our brand commercials, and Pace quickly became America's best-selling salsa. But nearly every retail chain that carried Pace put it on sale from time to time to create a favorable price disparity with other salsa brands, which gave consumers an immediate incentive to put a jar in their shopping carts.

48.     One of the things I learned early on in my career is that successful marketing campaigns are rarely those that merely find a clever way to say what the advertiser wants to say. Rather, the most effective ads are those that are predicated on responding to <u>what consumers want to hear</u>. And consumers want to hear about discount pricing; they want to get "a deal." In other words, they want to pay less for products than the typical price that consumers have to pay for that same product. I have yet to encounter a consumer for whom price is no object. It is always an important factor in the purchase decision process.

49.     In fact, a 2021 Publicis Sapient survey of 1,000 respondents from the United States, the U.K., France and Sweden demonstrates that getting a price discount (versus offers promising Free Shipping, or a Free Gift With Purchase) is the overwhelming "favorite" promotion among consumers, pretty much throughout the western world.[8]

50.     A 2018 survey conducted by RetailMeNot "… found that nearly three-fourths (74 percent) of Americans say offers are a top factor when deciding where and what to buy online. And four out of five (81 percent) of Americans say finding a great offer or discount is on their mind throughout the entire purchase journey. The survey found that two-thirds of consumers have "made a purchase they weren't originally planning to make solely based on finding a coupon or discount." Similarly, four out of five (80 percent) said

---

[8] https://www.statista.com/statistics/1270573/best-discounts-according-to-shoppers, accessed 2/16/2026.

they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[9] And a recent Invesp infographic reported on "How Discounts Affect Online Consumer Buying Behavior," stating that "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase," and that "83% of respondents said they were "somewhat likely" or "very likely" to click an ad offering a discount or promotion.[10] An important reason for this is that the perceived value of an item influences consumers' willingness to purchase the item. So, for example, a consumer who was only planning to spend $100 on a new armchair might be willing to spend more – say, $150.00 – if they find a 50% off deal on a more expensive armchair that usually retails for $300. This works especially well in markets where consumers are unaware of the true value of the product they are purchasing and so rely on the "regular" prices (or "list" prices) featured in an ad as indicators of true "value."

51.    In my experience, the desire by consumers for price-off (sale) pricing extends to nearly every product and service category. During the years I helped George Zimmer promise "I Guarantee it" in his many Men's Wearhouse television commercials, the chain conducted only one sale event a year, and it lasted for only one week each January. Amazingly, that one-week sale event generated more revenue each year for the

---

[9] Peter Roesler, *New Study Shows Deals and Promotions Affect Every Part of Shopping Experience*, Inc, (April 30, 2018), https://www.inc.com/peter-roesler/new-study-shows-deals-promotions-affect-every-part-of-shopping-experience.html#:~:text=A%20new%20survey%20from%20RetailMeNot,a%20business%20can%20be%20underestimated, accessed 2/16/2026.

[10] Khalid Saleh, *How Discounts Affect Online Consumer Buying Behavior*, Invesp, https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/#:~:text=More%20than%2070%25%20of%20US,offering%20a%20discount%20or%20promotion, accessed 2/16/2026.

chain than any full month. My Chevrolet dealer association clients typically offered discount pricing each summer to clear out inventory before new models hit the showrooms in the Fall. Consumers looking for "a deal" flocked to the event. Another former client, the Center Theatre Group, the preeminent theatrical presenter in the Los Angeles area, provides hundreds of reduced rate tickets for most of the big Broadway shows that play the Ahmanson Theatre to TodayTix, which in turn resells them at a substantial discount. Price conscious theater-goers snap them up.

52.    At any given time Disneyland (another former client) periodically offers multiple discounts to California residents, ranging from sale-priced admission tickets to 20-percent off stays at the resort's hotels. Smart consumers check the Disneyland website



*Figure 5.*
*https://disneyland.disney.go.com/offers-discounts/*

regularly to get the best deal on visits to the "Happiest Place on Earth." Nearly every airline, including my former clients American and Alaska, sometimes get involved in price wars with other carriers for certain city pairs. Sale pricing applies. Alaska, which started flying to Hawaii from San Francisco a few years ago, offered a limited number of seats for the first two weeks it flew the route at $39 each way to create marketplace buzz, and got it.

53.    Consumers appreciate limited-time or limited availability price-off deals so much that there have been instances where they "punish" marketers that do away with them. An article by Panos Mourdoukoutas in the February 24, 2017 issue of *Forbes* related how JC Penney lost its way after revamping its stores and replacing price-off store coupon sales with an "everyday low price" strategy. "But that strategy didn't work, as evidenced

23

by the company's string of disappointing sales and earnings reports…"[11] Another article, published by *CNN Business*, described Penney's move away from price-off coupon sales as a "disaster" and reported that Penney's "[s]ales tanked nearly 25% in a year and the company's stock plunged" after the change to its promotional pricing strategy.[12] Penney eventually returned to its former strategy of offering consumers price-off deals, but it appears that was a too little, too late move.[13]

## V. CONSUMERS VIEW SALES AS TIME-LIMITED OR AVAILABILITY-LIMITED AND THIS PLAYS AN IMPORTANT ROLE IN CONSUMER PURCHASING DECISIONS

54.    Consumers do not need a dictionary to understand that a sale is "a period during which a retailer sells goods at reduced prices."[14] In fact, in my experience the word "Sale" is understood by most consumers, regardless of the language they speak. And words and phrases like "%X off," "$X off," "discount," "save X%," "save $X," "promotional price" and/or the inclusion of strikethrough pricing entice shoppers to purchase sooner. "This can be attributed in part to the idea of scarcity, wherein consumers understand that there aren't always discounts available to help them save money. Additionally, *Psychology*

---

[11] Panos Mourdoukoutas, *A Strategic Mistake That Still Haunts JC Penney*, Forbes (Feb. 24, 2017), https://www.forbes.com/sites/panosmourdoukoutas/2017/02/24/a-strategic-mistake-that-still-haunts-jc-penney/?sh=630323941bcf, accessed 2/18/2026.

[12] Nathaniel Meyersohn*, JCPenney and Tied tried to get rid of coupons. It was a disaster*, CNN Business (Mar. 5, 2022), https://www.cnn.com/2022/03/05/business/coupons-history-jcpenney-macys-procter-and-gamble/index.html, accessed 2/18/2026.

[13] Panos Mourdoukoutas, *A Strategic Mistake That Still Haunts JC Penney*, Forbes (Feb. 24, 2017), https://www.forbes.com/sites/panosmourdoukoutas/2017/02/24/a-strategic-mistake-that-still-haunts-jc-penney/?sh=630323941bcf, accessed 2/18/2026.

[14] Oxford Languages' definition of "sale," as reported by Google search.

*Today* points out that 'anticipatory regret' (regret from missing out on the deal) is also a huge urgency driver when it comes to promotions."[15]

55.     Limited-time sale events are no mystery to consumers. Most of us grew up with parents and maybe even grandparents who were smart enough to take advantage of price-off deals, recognizing that sale pricing is a use it or lose it proposition. I have rarely seen a sale event fail for want of customers. That includes limited-time sales events for expensive products such as cars, ocean cruises and diamond jewelry, as well as for moderately or low-priced products like jeans, candy bars, hobby items, ice cream cones and soda. Most Americans try to take advantage of sales – and are often very excited to do so – all year long. That is why "Black Friday" and "Cyber Monday" sales have become so successful and anticipated by consumers. As discussed above, consumers really respond well to advertised sales, be they price-off's, BOGO's, free with purchase offers or other promotional deals that appear beneficial.

56.     In my experience, consumers understand "Sale," "% Off," "$X off', "Save X%," "Save $X," strikethrough pricing, and similar promotional statements to mean that a product that is usually sold at a "list" or "regular price" is now (or soon will be, when the sale takes effect) available at a lower price. Consumers understand the "list" or "regular price" to be the price at which the retailer typically sells the product at most of the time to most consumers, and that it represents the true "value" of the product in question, i.e., what the retailer has determined to be the market-clearing price for the product. Consumers understand that by taking advantage of the sale or discount they will benefit by being able

---

[15] *Leveraging the Psychology of Discounts to Make More Money*, Volusion (April 9, 2024), https://www.volusion.com/blog/using-the-psychology-of-discounts-to-make-more-money, accessed 2/18/2026.

to purchase the product at a discount for less than it typically and usually sells for. It is that simple. This is how true limited-time (or limited-availability) sales are typically advertised, and consumers are familiar with how these sales work and what the promotional messaging means.

57.    While consumers naturally understand that sales are time-limited (or limited in their availability), retailers often emphasize this explicitly by tying the sale to a season or event (e.g. "Memorial Day Sale" or "Spring Sale" or "July 4 Sale" or "Holiday Sale"). Consumers see the time limit as a warning: Act now or miss out on the deal. That creates urgency. This, in turn, drives sales. Consumers who may have waited to make a purchase until a later time accelerate their purchase decision to take advantage of the promotion. And consumers who otherwise might comparison shop and ultimately buy elsewhere might decide to buy now from the company marketing the sale to take advantage of the time-limited discount. This is especially true if they are already reasonably confident that they are getting a good deal considering that they are getting a discount.

58.    There is nothing wrong with the suggestion of an honest end date for a sale. But if the sale (or a similar sale) just pops up again shortly thereafter with a new purported time limit, and that pattern continues, that misleads ordinary, reasonable consumers. In short, a sale without an honest end date is actually not a sale, and a discount price without an honest end date is just a regular price. Saying otherwise is nothing more than an attempt to make a product's everyday price sound better than it really is.

59.    ███████████████████████████████████████

███████████████████████████████████████████[16]

---

[16] *See, e.g.,* Hadian depo tr. 88:1-19, 109:18-112:6.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████[17] ████████

███████████████████████████████████████████████████████████

█████ █ ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████[19]

60.        ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

█ ████ ████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████

██    ██   ███

---

[17] RugsUSA_Hong00000021 ███████████████████████████████████████████████;
McManic depo. tr. 58:9-21; 59:17-79:25.
[18] McManic depo. tr. 59:17-19, 59:24-60:14.
[19] RugsUSA_Hong00000021.

27



61.

---

[20] RUGSUSA_HONG00000511.
[21] Hadian depo. tr. 44:18-20.

62.    In addition to the strikethrough pricing, Defendant advertises a constant stream of promotional discounts, leading consumers to believe they are receiving an even further discounted price from what they perceive to be the typical and usual price. █████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ █ ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

63.    ████████████████████████████████████

████████████████████████████████████████████

████████████ █ ████████████████████████████

████████████████ █ ████████████████████████

██████████████████████████ █ ██████████████

████████████████████████████████████ █ ████

████████████████████████████████████████████

██████████████████████████ █ ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[22] RugsUSA_Hong00000006-13; RugsUSA_Hong00000056-79.
[23] RugsUSA_Hong00000007.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*



.[32]

## VI. CUSTOMERS ARE MORE LIKELY TO PURCHASE AN ITEM IF THEY THINK THEY ARE GETTING A GOOD DISCOUNT OFF THE REGULAR PRICE

64.     As previously discussed, many of my former clients are mass merchandisers, i.e., supermarkets and drug stores. Others fell into the big box category. I regularly made (and continue to make) it a practice to interview consumers on a one-on-one basis in the aisles of these retailers about their shopping habits. I call this practice "Marketplace Sleuthing."

65.     As much as I believe in quantitative marketing studies, nothing beats one-on-one conversations with consumers who are actually involved in deciding what to put in

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] RugsUSA_Hong00000006-13; RugsUSA_Hong00000056-79 ███████████
████████████████████████.
[32] RugsUSA_Hong00005688-A; RugsUSA_Hong00005689-A; RugsUSA_Hong00005696.

their shopping cart or not. The consumers I interviewed were hardly ever shy at pointing out the importance of price to them. But emotional benefits also mattered a lot. Shoppers told me that purchasing a discounted product made them feel more confident that they were making a smart decision. They most certainly weren't ashamed to say, "Hey, look how much I saved," or "It was a great deal."

66.    In my experience, consumers assume that a sale price (including a strikethrough, "X% Off," or "$X Off") is a discount off a product's former and regular (full) price. I observed many focus group sessions for retail clients such as Aaron Brothers Art Marts, Baskin-Robbins, C&R Clothiers, Carl's Jr., The Men's Wearhouse, Pioneer Chicken, Pizza Hut, Sears and Zales, as well as for the Disneyland and Walt Disney World and Universal Studios Hollywood and Universal Orlando attractions at which the subject of discount pricing was at issue. Our clients wanted to hear from customers and prospects about how frequently they thought sales should be held, how long a sale should run, to what degree prices should be cut, whether they should consider switching to a "low prices all the time" strategy, etc. Not surprisingly, nearly all the participants at these sessions understood that they would have paid more if they had made a purchase before a sale began, and nearly all assumed they would have had to pay more – i.e., the full price – if they waited and missed the sale altogether. I never once heard consumers say that they assumed or believed that sale prices were fake, i.e., that they were nothing more than a price that is regularly available claiming to be a sale price.

67.    It has also been my experience that customers of all types greatly value being able to compare the regular price of a product to the "discounted price." In fact, according to an analysis published by the American Marketing Association's Journal of Public Policy & Marketing, "Comparative price advertising offers consumers a basis for

31

comparing the relative value of the product offering by suggesting a monetary worth for the product and any potential savings. For example, the comparative price advertisement, 'regular price $10, on sale $7.99,' suggests a monetary worth of $10.00 and a savings of $2.01. To the extent that consumers do not have this information about potential savings, the comparative price advertisement is beneficial because more informed consumers are likely to make better purchase decisions." [33]

68.  "[34]

69.    This is illustrated in the ads that appear above in Figures 1-3. As a further example, in the product page below, the promotional message shows the purported regular price, which is crossed out ("$79"), the purported resultant sale price ("$49"), and the purported savings (the percentage off, "38%"):[35,36]

---

[33] Dhruv Grewal and Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive? Journal of Public Policy & Marketing*, Spring, 1992, Vol. 11, No 1, pp. 52-62. Sourced from https://journals.sagepub.com/doi/10.1177/074391569201100106, accessed 2/18/2026.
[34] Hadian depo tr. 88:1-19.
[35] Figure 6 is screenshot from https://www.rugsusa.com/products/maid-medallion-washable-rug-red?variant=51662672920870, accessed February 16, 2026. Figures 7 and 8 are screenshots from the same day, after clicking through the checkout process.
[36] This example also shows additional savings (on top of the 38% off) available from the "PRESDAY" sale.



*Figure 6. Product Page from Rugs USA website.*

70.    Similarly, the purported regular price of the product appears on Defendant's cart drawer (the pop-up preview of the cart page) and the cart page itself, samples of which appear below.



*Figure 7. Cart Preview Pop-Up from Rugs USA website.*

33



*Figure 8. Cart page from Rugs USA website.*

71.    But in Defendant's ads, the "regular" or "list" prices (shown here with strikethroughs) represent prices that are not the regular prices at all. They are not the regular prices because the products are regularly available for less. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

72.    As discussed in an article in the American Marketing Association's *Journal of Marketing*, "[i]t is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on a deal and the magnitude of this utility is a function of the size of the deal. Firms have long known (or at least intuitively known) this; in response they often feature the selling price relative to a reference price – for example, a 'former' price – to increase demand beyond the level solely induced by a

lower price. These two stylized facts have led some firms to artificially inflate reference or comparison prices in sale communications so as to increase consumers' perceived utility in their offerings, which in turn leads to greater demand and profits."[37]

73.    To summarize (and emphasize), the "regular" or "list" price that appears in Defendant's website, online ads, price quotes, and in its shopping cart pages is not the product's regular price, but rather, it is a misleading price since Rugs USA rarely sells its products at those prices. The regular price, the price at which Rugs USA typically sells its products, is instead a lower "discount price," which belies the alleged discount.

## VII. DEFENDANT'S "SALE" CLAIM WOULD BE IMPORTANT TO A REASONABLE CONSUMER IN DECIDING WHETHER TO PURCHASE ONE OR MORE OF ITS PRODUCTS

74.    It is important to recognize that the advertised items in this matter are, for most consumers, not frequently purchased products. They are not heads of lettuce or eggs that are purchased every week, or landscape products that are purchased as the seasons change, or up-sized clothing for growing kids. Rather, they are only purchased when they are specifically needed or wanted. Newly built homes and apartment units almost never come with rugs, rather, floors are covered with "permanent" materials such as wall-to-wall carpeting, hardwood or laminate flooring, or ceramic tiles. It is then left to the buyer or renter to decide if they want to add a decorative floor covering item such as a rug. When people move into an older home or previously occupied apartment they may or may not

---

[37] Richard Staelin (Professor of Marketing, Fuqua School of business, Duke University); Joel E Uerbany (Professor, Mendozza College of Business, University of Notre Dame); Donald Ngwe (Economist and Senior Principal Researcher, Microsoft, USA), *Competition and the Regulation of Fictious Pricing,* 87(6) American Marketing Association Journal of Marketing, 826 (2023).

need or want to add a rug or two. But if they do, they will find that there are lots of choices available, both at brick-and-mortar stores as well as from online merchants such as the defendant.

75. Most consumers who find themselves needing or wanting to purchase a rug are not likely to be terribly knowledgeable about what these flooring products cost because they have never – or at least, not recently – been in the market for them and, as a result, they won't be able to tell that advertised Sales Prices aren't any lower than legitimate Regular Prices. In addition, flooring products vary significantly in their quality and durability and thus, price, but these quality differences are not readily apparent to consumers when purchasing them—especially when consumers make their purchases online and so cannot inspect the products themselves directly and instead can only see images and descriptions of the products.

76. That is why the advertisements at issue in this matter would, in my opinion, be quite effective. Each advertisement promised big discounts which conveys the idea that the value of the advertised products is much higher than what customers would have to pay but for the promotion. And, because most customers are not used to purchasing rugs, and because rugs vary significantly in style, material and quality, they are not likely to know any better or be able to determine on their own whether the products are worth the purportedly regular "list" price Defendant is advertising.

77. In my experience, customers believe that a sale price promoted by a major retailer like Rugs USA is legitimate; i.e., it is a markdown from the established full price that the retailer normally charges for rugs on its website and that most people have to pay for the same thing. During the focus group sessions I observed where sales pricing was discussed, most of the participants believed that at least half the retailer's regular customers

lost out on getting a great deal because they missed the sale. They also admitted that sometimes they personally had (ruefully) missed out on a good deal by missing a promotional period.

78. In my experience, customers also expect advertised regular prices to reflect relatively recent prices (and not old, stale prices). Customers generally expect a regular price to reflect the price at which the seller primarily sold the product for in the recent past. I understand that legal claims in some jurisdictions use a lookback period of three months to determine the regular price. In my opinion, this time period is consistent with the expectations of reasonable consumers. In other words, if a listed price for a given rug is not the regular price at which Rugs USA sold the majority of units of that particular rug in the prior three months before a sale, this is misleading to reasonable consumers.

## VIII. IT IS PROBABLE THAT A SIGNIFICANT PORTION OF DEFENDANT'S GENERAL CONSUMING PUBLIC, ACTING REASONABLY IN THE CIRCUMSTANCES, WOULD BE MISLED BY ITS PROMOTIONAL MESSAGING

79. As previously discussed, consumers understand that promotional deals, i.e., discount or "sales" pricing, are operative for a limited time only, or are only available in special circumstances. As discussed above, the end date is intended to create urgency; consumers are much more likely to purchase the product being advertised sooner rather than later if they are aware that the sale price will not last forever.

80. But if the suggested end dates of Defendant's discount price promotions are largely meaningless, consumers would be misled as there would be no need for them to urgently take advantage of a fake "use it or lose it" time-limited promotion.

37

81.    My previous commentary regarding Defendant's Promotional Calendars and strikethrough methodology, as well as my review of Defendant's website, demonstrate that Defendant's promotional periods were anything but time-limited or availability limited. Therefore, I am of the opinion that Defendant's recurring, routinely available, advertised sales would mislead reasonable consumers.

82.    And as described above, Defendant's pricing is especially misleading because they offer double discounts – that is, they often show a reference price (or strikethrough price) next to a lower price (which Rugs USA calls a default price), and then further discount that lower default price with a promotional discount (e.g., an additional 20% off). So the advertised prices simply were not the prices at which the products were typically sold, or that most consumers paid. Simply stated, the list prices, or "regular prices," exist for the purpose of creating the illusion that the customer is getting a product worth more than what they are paying, at a meaningfully discounted price. That is fundamentally misleading.

83.    The list price featured in many of Defendant's home page, product pages, and cart pages is clearly intended to communicate to customers that it is the regular price for the advertised product. Ordinary consumers understand a list price to be a product's former and regular price; the price that Rugs USA typically charges consumers to buy the product and that most of its customers pay to buy the product. But once again, this is not true because what consumers typically pay for that product has nothing to do with how Rugs USA calculates that price; Defendant's products are rarely sold at that price and instead are routinely available for, and sold in the majority of cases, at a lower price; and the resultant purported discount price is not a true discount at all.

38

84.    Showing customers percentages off, or amounts off, or a strikethrough price, are common methods used by advertisers to demonstrate the disparity between the discount price and a regular price for an item, or their former price. But in this instance, the supposed discount price is misleading. In my opinion a reasonable consumer would be deceived and misled by Defendant's advertisements. Consumers believe and expect that they are getting a product valued at the advertised list price, when in fact they are getting a product valued at a lower price. Said differently, if a product is advertised as 20% off consumers believe and expect that they are getting a discount worth 20% of the purchase price, when in fact they are getting a much smaller discount worth much less, or, in many cases, no discount at all. Customers would not be getting the deal they believed they were getting by taking advantage of Defendant's purported discounts. Rather, they were paying the full, regular price (or a much smaller discount) and not getting the deal they believed they were getting.

85.    In my experience, customers hate to be misled, especially about discount deals.

## IX. A REASONABLE CUSTOMER WOULD RELY ON THE VERACITY OF DEFENDANT'S PRICE-OFF MESSAGING, i.e., THAT THE SALE PRICE IS TRULY LESS THAN THE REGULAR PRICE

86.    In my experience, while customers do not always trust product attribute or benefit claims in advertising, they do believe that the advertised price of a product, or an advertised discount for a product on sale, is true. That is because such advertisements are common and most advertisers actually deliver on those messages.

87.    I also am of the opinion that most consumers reasonably assume that the end dates of sale events (e.g. seasonal or holiday end dates) are for real. As a matter of

policy, my supermarket clients did not accept price-off coupons that had expired. My ocean cruise line clients did not extend the sales price of a given itinerary to prospective customers once the expiration date of the promotional rate had passed. My Baskin-Robbins client did not extend its season kick-off "Free Scoop Day" promotion to the day after the one-day promotion. Because businesses usually enforce sale expiration dates, consumers reasonably take those expiration dates at face value.

88.     Consumers are particularly likely to believe the messages that large, well-branded companies communicate. And Rugs USA falls into that category, which it touts on its website: "For over 25 years, Rugs USA has been the not-so-secret destination for finding perfect, design-forward rugs at prices that are (almost) unbelievable."[38] And, of course, its reach is national via its website, www.rugsusa.com.

89.     In my opinion customers do not (and should not be required to) act as "Deceptive Sale Detectives." A reasonable consumer would not (and should not be expected to) constantly monitor Defendant's website to try to determine if the sale price he or she paid was really a discounted price or rather, a camouflaged (by labeling it a sale price) regular price. A sale that is routinely available is not a sale. And sales prices are not legitimate when they are based on purportedly regular prices that are not actually the regular prices. Customers should not have to try to figure that out.

---

[38] https://www.rugsusa.com/pages/about, accessed February 12, 2026.

# X. IT IS UNLIKELY THAT A REASONABLE CONSUMER WOULD ACCESS AND READ THE DISCLAIMER. AND THE DISCLAIMER ITSELF IS DECEPTIVE TO A REASONABLE CONSUMER

90. ███████████████████████████████████████████

████████████████████████████████████████████████

███████████ [40]

*Figure 9. Product Page from Rugs USA website.*

91.    And, if a consumer clicks on the fine-print asterisk, a disclaimer pops up as shown in the figure below:

---

[39] Hadian depo tr. 115:9-11.
[40] Figure 7 is screenshot from https://www.rugsusa.com/products/maid-medallion-washable-rug-red?variant=51662672920870, accessed February 16, 2026

41



*Figure 10. Popup disclaimer.*

92.    As detailed above, I have devoted much of my career to understanding how consumers shop, how they compare products, and how closely they look at labels and point-of-sale ads. As previously stated, in my opinion Defendant's discount pricing, including strikethrough pricing, is a very motivating benefit and would be important to a reasonable consumer in deciding whether to purchase one of the Products at issue in this case. Strikethrough pricing unambiguously indicates to reasonable consumers that they are getting a discount off the former, regular price of the item. And, as explained below, the consumers' focus would be on the pricing itself. In my experience, reasonable consumers would not notice or think to click on the inconspicuous asterisk and would therefore be justifiably unaware of any disclaimer. Also, they would not expect any disclaimer to contradict their reasonable expectation that they are getting a discount off the former or regular price.

42

93.    During my years in the agency business, I was frequently required to include a disclaimer (or multiple disclaimers) in an ad or commercial I wrote or supervised. Every copywriter and every art director I worked with faced the same challenge, i.e., making the disclaimer that was written and provided to us by the agency's or client's attorneys as invisible or as unlikely to be read as possible. It is my experience that consumers rarely read disclaimers, assuming they see them at all. That does not make it right, but it is the way it is. And this disclaimer is no exception. It is not prominently featured as part of the purchasing process. ██████████████████████████████████████████████████████████████████████████████ ██████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████

94.    Further, it has been my experience that very few consumers make a point of checking the accuracy of each and every claim by reading fine print disclaimers that may accompany them. This is especially true when, like here, they are purchasing from a large, well-branded company, which is likely to be perceived as trustworthy. Consumers are not, and in my opinion should not be expected to be, "Claim Detectives." They have better things to do while shopping than try to analyze every line of copy that appears in an advertisement or product listing before making a purchase.

95.    Also, if a consumer did click on the fine-print asterisk and read the disclaimer, the text of the disclaimer itself just adds an additional layer of deception. Defendant's disclaimer states that the strikethrough price is a "Compare at Price" that

---

[41] Hadian depo. tr. 116:17-117:3, 118:5-11.

"indicates that the item (which may include a different color or pattern) was offered by other retailers at or above that price in the past 90 days. Compare at Price may not be the prevailing market price for an item." But the disclaimer does not explain the true way that the reference price, or the "Compare at Price," is determined.

96.    In my opinion, a reasonable consumer who reads Defendant's "Compare at Price" disclaimer would have an understanding of the Compare at Price and how it was determined that is entirely inconsistent from what it actually is (and how it was actually determined). For the same reasons expressed above, reasonable consumers would interpret the statement the product "was offered by other retailers at or above that price in the past 90 days" to mean that this was the most common price at which this product was offered and sold during that period.

97.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

98.    Also, the statement that the "Compare at Price may not be the prevailing market price for an item" would not affect the understanding of a reasonable consumer one way or the other because a reasonable consumer would not understand what "prevailing

44

market price" means. ██████████████████████████████████

████████████████████████████████████████████████████.[42]

99.    The opinions I have expressed herein are offered to a reasonable degree of certainty based on my experience as an advertising professional. I reserve the right to amend this report if I am provided with additional evidence obtained through discovery or otherwise, or if any expert witness report is received and/or any related deposition taken.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of February 2026 in Studio City, California.

_____
Bruce G. Silverman

---

[42] *See* McManic depo tr. 140:2-5 ████████████████████████████

████████████████████████████████████████████████.

# EXHIBIT A

## EXHIBITS AND OTHER MATERIAL REVIEWED

**Court Documents**

Complaint (3'17'25).pdf

Protective Order (10'21'25) - signed BGS.pdf

**Depositions**

Deposition transcript and Exhibits of David McManic, 02/05/2026

Deposition transcript and Exhibits of Parham Hadian, 02/06/2026

**"Footnotes" documents**

RugsUSA_Hong00000006-RugsUSA_Hong00000013.pdf

RugsUSA_Hong00000021.pdf

RugsUSA_Hong00000056-RugsUSA_Hong00000079.pdf

RUGSUSA_HONG00000511_Confidential.xls

RUGSUSA_HONG00005688-A-CONFIDENTIAL.xlsx

RUGSUSA_HONG00005689-A-CONFIDENTIAL.xlsx

RUGSUSA_HONG00005696-CONFIDENTIAL.xlsx

**Website Images Produced in Preciado**

| | |
|---|---|
| PRECIADO000478.pdf | PRECIADO000467.pdf |
| PRECIADO000241.pdf | PRECIADO000338.pdf |
| PRECIADO000613.pdf | PRECIADO000440.pdf |
| PRECIADO000620.pdf | PRECIADO000208.pdf |
| PRECIADO000344.pdf | PRECIADO000384.pdf |
| PRECIADO000636.pdf | PRECIADO000165.pdf |
| PRECIADO000470.pdf | PRECIADO000276.pdf |
| PRECIADO000728.pdf | PRECIADO000464.pdf |
| PRECIADO000747.pdf | PRECIADO000736.pdf |
| PRECIADO000193.pdf | PRECIADO000739.pdf |
| PRECIADO000594.pdf | PRECIADO000418.pdf |
| PRECIADO000301.pdf | PRECIADO000220.pdf |

PRECIADO000169.pdf                    PRECIADO000607.pdf

PRECIADO000037.pdf                    PRECIADO000502.pdf

PRECIADO000517.pdf                    PRECIADO000612.pdf

PRECIADO000484.pdf                    PRECIADO000547.pdf

PRECIADO000428.pdf                    PRECIADO000731.pdf

PRECIADO000410.pdf                    PRECIADO000244.pdf

PRECIADO000254.pdf                    PRECIADO000029.pdf

PRECIADO000113.pdf                    PRECIADO000153.pdf

PRECIADO000216.pdf                    PRECIADO000514.pdf

PRECIADO000582.pdf                    PRECIADO000749.pdf

PRECIADO000581.pdf                    PRECIADO000125.pdf

PRECIADO000644.pdf                    PRECIADO000606.pdf

PRECIADO000570.pdf                    PRECIADO000487.pdf

PRECIADO000262.pdf                    PRECIADO000347.pdf

PRECIADO000238.pdf                    PRECIADO000157.pdf

PRECIADO000505.pdf                    PRECIADO000098.pdf

PRECIADO000356.pdf                    PRECIADO000473.pdf

PRECIADO000539.pdf                    PRECIADO000129.pdf

PRECIADO000270.pdf                    PRECIADO000536.pdf

PRECIADO000641.pdf                    PRECIADO000599.pdf

PRECIADO000332.pdf                    PRECIADO000421.pdf

PRECIADO000533.pdf                    PRECIADO000033.pdf

PRECIADO000371.pdf                    PRECIADO000065.pdf

PRECIADO000368.pdf                    PRECIADO000753.pdf

PRECIADO000380.pdf                    PRECIADO000061.pdf

PRECIADO000654.pdf                    PRECIADO000455.pdf

PRECIADO000173.pdf                    PRECIADO000603.pdf

PRECIADO000609.pdf                    PRECIADO000531.pdf

PRECIADO000589.pdf                    PRECIADO000069.pdf

PRECIADO000577.pdf                    PRECIADO000294.pdf

PRECIADO000661.pdf                    PRECIADO000045.pdf

PRECIADO000550.pdf                    PRECIADO000432.pdf

PRECIADO000137.pdf                    PRECIADO000017.pdf

PRECIADO000359.pdf          PRECIADO000481.pdf

PRECIADO000682.pdf          PRECIADO000145.pdf

PRECIADO000001.pdf          PRECIADO000073.pdf

PRECIADO000021.pdf          PRECIADO000597.pdf

PRECIADO000733.pdf          PRECIADO000526.pdf

PRECIADO000542.pdf          PRECIADO000627.pdf

PRECIADO000529.pdf          PRECIADO000224.pdf

PRECIADO000444.pdf          PRECIADO000328.pdf

PRECIADO000057.pdf          PRECIADO000378.pdf

PRECIADO000596.pdf          PRECIADO000181.pdf

PRECIADO000508.pdf          PRECIADO000200.pdf

PRECIADO000751.pdf          PRECIADO000614.pdf

PRECIADO000545.pdf          PRECIADO000279.pdf

PRECIADO000185.pdf          PRECIADO000313.pdf

PRECIADO000049.pdf          PRECIADO000523.pdf

PRECIADO000677.pdf          PRECIADO000391.pdf

PRECIADO000742.pdf          PRECIADO000583.pdf

PRECIADO000553.pdf          PRECIADO000586.pdf

PRECIADO000365.pdf          PRECIADO000285.pdf

PRECIADO000561.pdf          PRECIADO000117.pdf

PRECIADO000013.pdf          PRECIADO000350.pdf

PRECIADO000382.pdf          PRECIADO000297.pdf

PRECIADO000496.pdf          PRECIADO000247.pdf

PRECIADO000700.pdf          PRECIADO000273.pdf

PRECIADO000493.pdf          PRECIADO000556.pdf

PRECIADO000212.pdf          PRECIADO000587.pdf

PRECIADO000651.pdf          PRECIADO000316.pdf

PRECIADO000288.pdf          PRECIADO000009.pdf

PRECIADO000324.pdf          PRECIADO000053.pdf

PRECIADO000520.pdf          PRECIADO000436.pdf

PRECIADO000320.pdf          PRECIADO000688.pdf

PRECIADO000567.pdf          PRECIADO000231.pdf

PRECIADO000177.pdf          PRECIADO000291.pdf

| | |
|---|---|
| PRECIADO000376.pdf | PRECIADO000133.pdf |
| PRECIADO000204.pdf | PRECIADO000490.pdf |
| PRECIADO000632.pdf | PRECIADO000251.pdf |
| PRECIADO000694.pdf | PRECIADO000705.pdf |
| PRECIADO000282.pdf | PRECIADO000341.pdf |
| PRECIADO000041.pdf | PRECIADO000374.pdf |
| PRECIADO000605.pdf | PRECIADO000189.pdf |
| PRECIADO000559.pdf | PRECIADO000386.pdf |
| PRECIADO000258.pdf | PRECIADO000595.pdf |
| PRECIADO000600.pdf | PRECIADO000458.pdf |
| PRECIADO000393.pdf | PRECIADO000461.pdf |
| PRECIADO000588.pdf | PRECIADO000573.pdf |
| PRECIADO000353.pdf | PRECIADO000395.pdf |
| PRECIADO000025.pdf | PRECIADO000657.pdf |
| PRECIADO000601.pdf | PRECIADO000610.pdf |
| PRECIADO000598.pdf | PRECIADO000725.pdf |
| PRECIADO000161.pdf | PRECIADO000668.pdf |
| PRECIADO000604.pdf | PRECIADO000103.pdf |
| PRECIADO000499.pdf | PRECIADO000309.pdf |
| PRECIADO000648.pdf | PRECIADO000149.pdf |
| PRECIADO000362.pdf | PRECIADO000624.pdf |
| PRECIADO000227.pdf | PRECIADO000398.pdf |
| PRECIADO000564.pdf | PRECIADO000404.pdf |
| PRECIADO000235.pdf | PRECIADO000141.pdf |
| PRECIADO000078.pdf | PRECIADO000088.pdf |
| PRECIADO000335.pdf | PRECIADO000083.pdf |
| PRECIADO000305.pdf | PRECIADO000452.pdf |
| PRECIADO000121.pdf | PRECIADO000401.pdf |
| PRECIADO000585.pdf | PRECIADO000590.pdf |
| PRECIADO000407.pdf | PRECIADO000757.pdf |
| PRECIADO000196.pdf | PRECIADO000611.pdf |
| PRECIADO000665.pdf | PRECIADO000424.pdf |
| PRECIADO000584.pdf | PRECIADO000760.pdf |

PRECIADO000674.pdf    PRECIADO000413.pdf

PRECIADO000005.pdf    PRECIADO000671.pdf

PRECIADO000108.pdf    PRECIADO000617.pdf

PRECIADO000266.pdf    PRECIADO000712.pdf

PRECIADO000602.pdf    PRECIADO000448.pdf

PRECIADO000608.pdf    PRECIADO000511.pdf

PRECIADO000093.pdf


**Website Images Produced in Hong**

HONG000035.pdf    HONG000017.pdf

HONG000596.pdf    HONG000614.pdf

HONG000011.pdf    HONG000604.pdf

HONG000181.pdf    HONG000616.pdf

HONG000004.pdf    HONG000605.pdf

HONG000220.pdf    HONG000236.pdf

HONG000034.pdf    HONG000557.pdf

HONG000247.pdf    HONG000606.pdf

HONG000013.pdf    HONG000254.pdf

HONG000366.pdf    HONG000583.pdf

HONG000024.pdf    HONG000307.pdf

HONG000411.pdf    HONG000351.pdf

HONG000015.pdf    HONG000569.pdf

HONG000602.pdf    HONG000062.pdf

HONG000030.pdf    HONG000348.pdf

HONG000645.pdf    HONG000400.pdf

HONG000001.pdf    HONG000137.pdf

HONG000603.pdf    HONG000375.pdf

HONG000006.pdf    HONG000426.pdf

HONG000613.pdf    HONG000398.pdf

HONG000027.pdf    HONG000472.pdf

HONG000537.pdf    HONG000082.pdf

HONG000021.pdf    HONG000292.pdf

HONG000628.pdf    HONG000251.pdf

HONG000437.pdf                          HONG000546.pdf

HONG000070.pdf                          HONG000169.pdf

HONG000038.pdf                          HONG000149.pdf

HONG000407.pdf                          HONG000611.pdf

HONG000201.pdf                          HONG000173.pdf

HONG000655.pdf                          HONG000340.pdf

HONG000165.pdf                          HONG000372.pdf

HONG000390.pdf                          HONG000394.pdf

HONG000270.pdf                          HONG000468.pdf

HONG000141.pdf                          HONG000601.pdf

HONG000102.pdf                          HONG000434.pdf

HONG000263.pdf                          HONG000579.pdf

HONG000289.pdf                          HONG000526.pdf

HONG000050.pdf                          HONG000298.pdf

HONG000600.pdf                          HONG000260.pdf

HONG000354.pdf                          HONG000336.pdf

HONG000369.pdf                          HONG000608.pdf

HONG000487.pdf                          HONG000278.pdf

HONG000321.pdf                          HONG000396.pdf

HONG000090.pdf                          HONG000420.pdf

HONG000549.pdf                          HONG000640.pdf

HONG000216.pdf                          HONG000543.pdf

HONG000552.pdf                          HONG000452.pdf

HONG000597.pdf                          HONG000572.pdf

HONG000586.pdf                          HONG000402.pdf

HONG000332.pdf                          HONG000618.pdf

HONG000448.pdf                          HONG000652.pdf

HONG000609.pdf                          HONG000624.pdf

HONG000205.pdf                          HONG000585.pdf

HONG000621.pdf                          HONG000054.pdf

HONG000610.pdf                          HONG000286.pdf

HONG000185.pdf                          HONG000658.pdf

HONG000584.pdf                          HONG000086.pdf

| | |
|---|---|
| HONG000381.pdf | HONG000042.pdf |
| HONG000444.pdf | HONG000636.pdf |
| HONG000493.pdf | HONG000592.pdf |
| HONG000478.pdf | HONG000523.pdf |
| HONG000530.pdf | HONG000228.pdf |
| HONG000615.pdf | HONG000197.pdf |
| HONG000484.pdf | HONG000304.pdf |
| HONG000540.pdf | HONG000417.pdf |
| HONG000384.pdf | HONG000363.pdf |
| HONG000212.pdf | HONG000387.pdf |
| HONG000554.pdf | HONG000631.pdf |
| HONG000464.pdf | HONG000617.pdf |
| HONG000267.pdf | HONG000519.pdf |
| HONG000074.pdf | HONG000409.pdf |
| HONG000098.pdf | HONG000078.pdf |
| HONG000360.pdf | HONG000157.pdf |
| HONG000240.pdf | HONG000295.pdf |
| HONG000566.pdf | HONG000575.pdf |
| HONG000329.pdf | HONG000177.pdf |
| HONG000107.pdf | HONG000066.pdf |
| HONG000310.pdf | HONG000058.pdf |
| HONG000392.pdf | HONG000648.pdf |
| HONG000344.pdf | HONG000587.pdf |
| HONG000132.pdf | HONG000046.pdf |
| HONG000189.pdf | HONG000224.pdf |
| HONG000481.pdf | HONG000301.pdf |
| HONG000094.pdf | HONG000414.pdf |
| HONG000193.pdf | HONG000563.pdf |
| HONG000317.pdf | HONG000534.pdf |
| HONG000591.pdf | HONG000607.pdf |
| HONG000161.pdf | HONG000589.pdf |
| HONG000325.pdf | HONG000590.pdf |
| HONG000612.pdf | HONG000232.pdf |

54

HONG000313.pdf                    HONG000112.pdf

HONG000475.pdf                    HONG000440.pdf

HONG000209.pdf                    HONG000516.pdf

HONG000243.pdf                    HONG000423.pdf

HONG000357.pdf                    HONG000145.pdf

HONG000498.pdf                    HONG000490.pdf

HONG000274.pdf                    HONG000501.pdf

HONG000282.pdf                    HONG000512.pdf

HONG000456.pdf                    HONG000460.pdf

HONG000509.pdf                    HONG000506.pdf

HONG000560.pdf                    HONG000378.pdf

HONG000257.pdf                    HONG000117.pdf

HONG000153.pdf                    HONG000122.pdf

HONG000588.pdf                    HONG000429.pdf

HONG000127.pdf

# EXHIBIT B

**BRUCE G. SILVERMAN**
*CURRICULUM VITAE*

May 2005 – Present

**SILVERMAN CONSULTING LLC (Los Angeles)**
**Principal**

Advertising and branding consultant to advertisers and advertising agencies in the U.S., Europe and Asia engaged in marketing consumer goods and services. Consultant and expert witness for law firms throughout the U.S. and U.K. on cases where false/misleading advertising, trademark infringement, advertising industry custom and practice, publicity rights and/or media are at issue.

January 2003 – April 2005

**WONG DOODY ADVERTISING (Los Angeles)**
**President and Partner**

Privately-owned, award-winning advertising agency with offices in Los Angeles and Seattle. Clients included Alaska Airlines, Alpine Electronics, Autodesk, Clif Bar, Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, UCLA/Anderson School of Management.

March 1997 – Dec. 2002

**INITIATIVE PARTNERS (Los Angeles)**
**President/CEO; Member, Initiative Worldwide Board of Directors**

Principal U.S. unit of world's largest ($22BB+) advertising media planning and buying agency. Clients included Acura, Albertson's, Arco, Carl's Jr/Hardee's, Baskin-Robbins, Chevrolet, Cisco Systems, Intel, Walt Disney Company, E*Trade, The Home Depot, Johnson & Johnson, Kaiser-Permanente, Six Flags, Taco Bell, U.S. Navy Recruiting Command, Unilever, plus more than 100 advertising agencies operating throughout the United States and Canada.

January 1986 – March 1997    **ASHER/GOULD ADVERTISING, INC. (Los Angeles)**
**President, Chief Creative Officer, Chief Operating Officer and Partner**

Privately-owned, top 100 advertising agency with offices in Los Angeles and Las Vegas. Clients included American Savings Bank, Avery Dennison, Baskin-Robbins, HBO, ITT/Sheraton, The Men's Wearhouse, Pabst Brewing Company, Pizza Hut, MGM Resorts, Sanyo, Southern California Cable Marketing Council, Suzuki cars and trucks, State of California Department of Health Services, SunAmerica

January 1984 – Dec. 1986    **BBDO/WEST, INC. (Los Angeles, San Francisco)**
**Executive Vice President, General Manager, Chief Creative Officer and Director**
West Coast division of Top 10 global advertising agency. Accounts included Apple Computer International, Coldwell Banker, HBO, Hughes Supermarkets, Pepsi, PIP Printing, Sanyo/Fisher, Sebastiani Vineyards, Sizzler, Southern California Dodge Dealers, Union Bank

January 1981 – Dec. 1983    **BOZELL & JACOBS, SOUTHWEST, INC. (Dallas)**
**Executive Vice President, Chief Creative Officer**
Southwest division of Top 10 U.S. advertising agency. Accounts included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay Cosmetics, Pace Foods, Quaker Oats, Southwestern Bell, Symantec, Zale Corporation.

August 1967 – Dec. 1980    **OGILVY & MATHER, INC. (New York)**
**Senior Vice President, Executive Creative Director, Member, O&M USA Council of Directors**
Top five global advertising agency. Executive Creative Director and General Manager, O&M Los Angeles (1977-80); Creative Director, O&M Houston (1974-77); Associate Creative Director, O&M London (1974), Associate Creative Director, O&M New York (1972-73).

Accounts included American Express, British Travel Association, Dove, French Tourism, Hershey Foods, IBM, Imperial margarine, KLM, Korean Airlines, Panasonic, Post cereals, Puerto Rico Tourism, Mattel, Maxwell House,

|  | MTV, Mercedes Benz, Merrill Lynch, Nabisco, Nickelodeon, Shell, Smith Barney, Trailways, TWA, Universal Studios |
|---|---|
| **EDUCATION** | June 1966 BA, Adelphi University, Garden City, New York |
| **INDUSTRY** | Vice Chairman, Western Region – American Association of Advertising Agencies (industry trade association) (1995-2002) |
|  | National Board of Directors – American Association of Advertising Agencies (1995-2002) |
|  | Vice President – Los Angeles Advertising Agencies Association (1995-2002) |
|  | Member, Los Angeles Advertising Club (1978-1980; 1984-2005) |
|  | Vice President – Dallas Advertising Club (1981-1983) |
|  | Vice President – Houston Advertising Federation (1975-1977 |
|  | Member – The Television Academy |
|  | Director – Los Angeles Chapter, Forensic Expert Witness Association (2006-2009) |
| **TEACHING POSITIONS** | Instructor: Pepperdine University, UCLA Extension |
|  | Guest Instructor: Arizona State University, California State University Northridge, California State University San Diego, California State University Los Angeles, California State University San Francisco, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Hawaii, University of Houston, University of Southern California, University of Texas, Thunderbird School of Management; Dean's Board of Advisors, UCLA Extension |

58

| | |
|---|---|
| **OTHER** | Author: *How to Create Tobacco-Use Prevention Advertising That Works*; University of Florida Press, 1996 |
| | Media Appearances:  Frequent "advertising/marketing guest authority" on Bloomberg News, NBC News, ABC 20/20; cited in articles in *Wall Street Journal, New York Times, Los Angeles Times, Washington Post, USA Today, Advertising Age, AdWeek* |
| **AWARDS:** | Multiple Clios, One Show "Pencils," multiple Beldings, two Gold Lions at Cannes International Advertising Festival; three "Effie" awards, two David Ogilvy Awards. |

59

**ADVERTISING/BRANDING CLIENTS SERVED (BY CATEGORY)**
**(Partial List; 1968-2023)**

**Apparel/Fashion**

C&R Clothiers (Asher/Gould)

Cherokee Apparel (Asher/Gould)

The Men's Wearhouse (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Kennedy's Clothiers (Asher/Gould)

London Fog (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

**Automotive**

Acura (Initiative)

Chevrolet (Initiative)

Dodge and Dodge Dealer Associations (BBDO)

Kia (Initiative)

Jaguar (Bozell)

Mercedes-Benz (Ogilvy)

Peugeot (Ogilvy)

Suzuki (Asher/Gould)

**Beverages**

Ballantine Ale (Asher/Gould)

Brew 102 Beer (Asher/Gould)

Country Club Malt Liquor (Asher/Gould)

Country Time Lemonade (Ogilvy)

Falstaff Beer (Ogilvy; Asher/Gould)

Hamm's Beer (Asher/Gould)

Mountain Dew (Ogilvy)

M. LaMont Vineyards (Ogilvy)

Old Crow Bourbon Whisky (Ogilvy)

Olde English 800 Malt Liquor (Asher/Gould)

Olympia Beer (Asher/Gould)

Pabst Blue Ribbon Beer (Asher/Gould)

Pearl Beer (Asher/Gould)

60

Pepsi Light (Ogilvy)

Pepsi-Cola (BBDO)

Private Stock Malt Liquor by Haffenreffer (Asher/Gould)

Schaeffer Beer (Ogilvy)

Sebastiani Vineyards (BBDO)

Stolichnaya Vodka (Ogilvy)

Van Gogh Vodka (Wong Doody)

Vitel Mineral Water (BBDO)

**Corporate**

Autodesk (Wong Doody)

Avery Dennison (Asher/Gould)

Cerner Corporation (Silverman LLC)

Cessna Citation (Ogilvy)

Church of Jesus Christ of Latter-Day Saints (Initiative)

City Investing (Ogilvy)

Cooper Industries (Ogilvy)

Dresser Industries (Ogilvy)

IBM (Ogilvy)

International Nickel (Ogilvy)

International Paper (Ogilvy)

Owens-Corning Fiberglas (Ogilvy)

Rail LA (Silverman LLC)

Shell Oil Company (Ogilvy)

Worldwide Church of God (BBDO)

**Consumer Electronics**

Alpine Electronics (Wong Doody)

Circuit City (Asher/Gould)

Concord Electronics (BBDO)

Fisher (BBDO)

Panasonic (Ogilvy)

Sanyo (Asher/Gould)

61

| | |
|---|---|
| **Direct Response** | American Express cards (Ogilvy) |
| | Associates Financial (Bozell) |
| | Bally's Health and Fitness (Initiative) |
| | Bryman College (Asher/Gould) |
| | HBO (Asher/Gould) |
| | Intercept Program (Asher/Gould) |
| | Jenny Craig (Initiative) |
| | Kaiser/Permanente (Initiative) |
| | Law Offices of Larry H. Parker (Asher/Gould; Silverman LLC) |
| | Mobile Dynamics (Wong Doody) |
| | National Education Centers (Asher/Gould) |
| | Paintrol Clinics (Asher/Gould) |
| | Southern California Cable Marketing Council (Asher/Gould) |
| | UCLA Anderson School of Management (Wong Doody) |
| | |
| **Education** | Bryman College (Asher/Gould) |
| | Geisinger Commonwealth School of Medicine (Silverman LLC) |
| | Mobile Dynamics (Wong Doody) |
| | National Education Centers (Asher/Gould) |
| | National University (Initiative) |
| | UCLA Anderson School of Management (Wong Doody) |
| **Entertainment** | Albuquerque Studios (Silverman LLC) |
| | Big Moving Pictures (Silverman LLC) |
| | Buena Vista Pictures (Initiative) |
| | Center Theatre Group/Ahmanson Theatre; Mark Taper Forum (Initiative) |
| | Circus World (Ogilvy) |
| | Disney Home Video (Initiative) |
| | Disneyland (Initiative) |
| | Dynasty Visual Effects and Animation (Silverman LLC) |

Grand Ol' Opry (Ogilvy)

HBO (BBDO and Asher/Gould)

Houston Grand Opera (Ogilvy)

Los Angeles Dodgers (Wong Doody)

MGM Home Video (Wong Doody)

MTV (Ogilvy)

Nickelodeon (Ogilvy)

Opryland USA (Ogilvy)

Pacific Ventures (Silverman LLC)

Ringling Brothers Barnum & Bailey Circus (Ogilvy)

Six Flags (Ogilvy and Initiative)

Sony Pictures Digital Entertainment (Wong Doody)

Southern California Cable Marketing Council (Asher/Gould)

The Walt Disney Company (Initiative)

Touchstone Pictures (Initiative)

UCLA Athletics (Silverman LLC)

UPN (United Paramount Network) (Initiative)

Walt Disney Pictures (Initiative)

Walt Disney World (Initiative)

Warner Brothers  (Initiative)

World Poker Tour (Wong Doody)

**Financial Services**      Allied Bank of Texas (Bozell)

American Express Credit Cards (Ogilvy)

American Express International Bank (Ogilvy)

American Savings Bank (Asher/Gould)

Associates Financial (Bozell)

Bowery Savings Bank (Ogilvy)

E*Trade (Initiative)

Gibraltar Savings & Loan of California (Ogilvy)

Gibraltar Savings & Loan of Texas (Ogilvy)

Merrill Lynch (Ogilvy)

63

J. P. Morgan & Co. (Ogilvy)

Nationwide Insurance (Ogilvy)

Plastic Cash International  (Wong Doody)

Republic Bank of Texas (Bozell)

Smith Barney (Ogilvy)

SunAmerica (Asher/Gould)

Union Bank of California (BBDO)

U.S. Trust (Ogilvy)

Valley National Bank – AZ (Bozell)

Wei Dong Investment Holdings Ltd. (Silverman LLC)

**Gaming**

Augustine Casino (Wong Doody)

Bellagio Hotel & Casino (Initiative)

California Lottery (Initiative)

Desert Inn Hotel & Casino (Asher/Gould)

Las Vegas Convention and Visitor's Authority (Initiative)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Treasure Island Hotel & Casino (Initiative)

**Grocery Products (includes. Packaged Goods)**

Armour Dinner Classics (Bozell)

Armour Hot Dogs (Bozell)

Armour Deli Meats (Bozell)

Balance Bar (Initiative)

Beijing Zhong Gao International HR Co. Ltd. (Silverman LLC)

California Avocados (Asher/Gould)

California Eggs (Asher/Gould)

Clif Bar (Wong Doody)

Conagra Foods (Bozell)

Gaines (Ogilvy)

Dove Liquid (Ogilvy)

64

Enfamil infant formula (Ogilvy)

Heath Bars (Bozell)

Hershey (Ogilvy)

Imperial Margarine (Ogilvy)

Luna Bar (Wong Doody)

Nabisco Double Stuf (Ogilvy)

Nabisco Krazy Glazy (Ogilvy)

Nabisco Premium Saltine Crackers (Ogilvy)

Nabisco Sooper Kookies (Ogilvy)

Pace Picante Sauce (Bozell)

Pepperidge Farm (Ogilvy)

Post Alpha-Bits (Ogilvy)

Post Cocoa Pebbles (Ogilvy)

Post Fruity Pebbles (Ogilvy)

Post Super Sugar Crisp (Ogilvy)

Purina Dog Chow (Ogilvy)

Quaker Oats (Bozell)

Quaker Chewy Granola Bars (Bozell)

Quaker Masa Harina (Bozell)

Quaker 100% Natural Cereal (Bozell)

Ralston-Purina Cookie Crisp cereal (Ogilvy)

Reese's Peanut Butter Cups (Ogilvy)

Swanson Frozen Dinners (Ogilvy)

**Health & Beauty Aids**    Avon Cosmetics (Ogilvy)

Contac (Ogilvy)

Dove Beauty Bar (Ogilvy)

Kinerase (Wong Doody)

Mary Kay Cosmetics (Bozell)

Mead-Johnson Enfamil (Ogilvy)

Mead-Johnson Metrecal (Ogilvy)

Pears Soap (Ogilvy)

Rembrandt Whitening Toothpaste (Wong Doody)

65

|  | Twice as Nice shampoo (Ogilvy) |
|---|---|
| **Healthcare** | Cedars-Sinai Health System (Silverman LLC) |
|  | Century Aesthetics (Silverman LLC) |
|  | Century City Doctors Hospital (Silverman LLC) |
|  | Contac Cold and Flu medicine (Ogilvy) |
|  | Cerner Corporation (Silverman LLC) |
|  | Doctor Campbell Credit Dentists (Asher/Gould) |
|  | Geisinger Health (Silverman LLC) |
|  | Intercept Program (Asher/Gould) |
|  | Kaiser Permanente (Initiative) |
|  | Modern Diagnostics (Silverman LLC) |
|  | Paintrol Clinics (Asher/Gould) |
|  | Private Health Management (Silverman LLC) |
|  | Salus Surgical Centers (Silverman LLC) |
|  | UCLA Health System (Silverman LLC) |
|  | United Health Plan (Asher/Gould) |
|  | Virginia Mason Medical Center (Wong Doody) |
| **Hi-Tech** | Apple Computers/International (BBDO) |
|  | Autodesk (Wong Doody) |
|  | Cadforce (Silverman LLC) |
|  | Cerner Corporation (Silverman LLC) |
|  | Cisco (Initiative) |
|  | Compaq (Ogilvy) |
|  | Gateway (Initiative) |
|  | IBM (Ogilvy) |
|  | Intel (Initiative) |
|  | Symantec (Bozell) |
| **Industrial** | Cessna (Ogilvy; Bozell) |
|  | International Nickel (Ogilvy) |
|  | International Paper (Ogilvy) |
|  | Dresser Industries (Ogilvy) |

|  | Falcon Waterfree (Silverman LLC) |
|  | Owens-Corning Fiberglas (Ogilvy) |
|  | Shell Farm Chemicals (Ogilvy) |
|  | Shell Industrial Chemicals (Ogilvy) |
|  | Shell Plastics, Resins and Synthetic Rubber (Ogilvy) |
| **Internet** | America On-Line (Initiative) |
|  | E-Trade On-Line (Initiative) |
|  | Event 411.com (Initiative) |
|  | Petstore.com (Initiative) |
|  | PlasticCash.com (Wong Doody) |
|  | Yahoo! (Initiative) |
| **Marketing Communications Agencies** | Ayzenberg (Silverman LLC) |
|  | Beijing Reach-All Investment Company Ltd. (Silverman LLC) |
|  | BH Direct (Silverman LLC) |
|  | Bright Strategic Design (Silverman LLC) |
|  | Bullpen Integrated Marketing (Silverman LLC) |
|  | Donnenfeld & Associates (Silverman LLC) |
|  | Eclipse Studio, Beijing (Silverman LLC) |
|  | Glyphix (Silverman LLC) |
|  | Horizon Media (Silverman LLC) |
|  | M Creative Group (Silverman LLC) |
|  | Nice Advertising (Silverman LLC) |
|  | The Phelps Group (Silverman LLC) |
|  | Radarworks (Silverman LLC) |
|  | Rogers & Associates (Silverman LLC) |
|  | Schiller LLC (Silverman LLC) |
|  | U.S. International Media (Silverman LLC) |
|  | The Woo Agency (Silverman LLC) |

| | |
|---|---|
| **Media/Publishing** | 24/6 Media dba Pocket Billboards (Silverman LLC) |
| | Bulzi (Silverman LLC) |
| | The Equestrian News (Silverman LLC) |
| | Frontiers Media LLC (Silverman LLC) |
| | HBO (BBDO and Asher/Gould) |
| | KCAL 9 Television (Initiative) |
| | Sirius XM (Silverman LLC) |
| | Southern California Cable Marketing Council (Asher/Gould) |
| | Triton Media (Silverman LLC) |
| | UPN (United Paramount Network) (Initiative) |
| **Miscellaneous Products** | Paragon Luggage (Wong Doody) |
| | Steuben Glass (Ogilvy) |
| | Zippo (Ogilvy) |
| **Office Products** | Avery Dennison (Asher/Gould) |
| | Intuit – QuickBooks (Wong Doody) |
| **Petroleum Products** | Arco (Initiative) |
| | Shell Fire & Ice Motor Oil (Ogilvy) |
| | Shell Gasoline (Ogilvy) |
| **Professional Services** | Cadforce (Silverman LLC) |
| | CFO911 (Silverman LLC) |
| | Law Offices of Larry H. Parker, Inc. (Asher/Gould; Silverman LLC) |
| | Perona, Langer, Beck Inc. (Silverman LLC) |
| **Real Estate** | Coldwell Banker (BBDO) |
| | Esprit (Silverman LLC) |
| | Move.com (Silverman LLC) |
| | Pacifica Ventures (Silverman LLC) |
| | Relocation.com (Silverman LLC) |
| | Waterwood (Ogilvy) |
| | The Woodlands (Ogilvy) |

| | |
|---|---|
| **Restaurants** | Acapulco (Asher/Gould) |
| | Baskin-Robbins (Ogilvy; Asher/Gould) |
| | Bennigan's (Bozell) |
| | Burger Chef (Ogilvy) |
| | Carl's Jr. (Initiative) |
| | Der Weinerschnitzel (Initiative) |
| | Godfather's Pizza (Bozell) |
| | Hardee's (Initiative) |
| | KFC (Initiative) |
| | Packard's Grill (Asher/Gould) |
| | Pioneer Chicken (Asher/Gould) |
| | Pizza Hut (Asher/Gould) |
| | Sizzler (BBDO) |
| | Steak & Ale (Bozell) |
| | Taco Bell (Initiative) |
| | Togo's (Initiative) |
| | Tom Sawyer's Old Fashioned Fried Chicken (Ogilvy) |
| **Retail** | Aaron Brothers Art Marts (Asher/Gould) |
| | Albertson's Supermarkets (Initiative) |
| | Arco (Initiative) |
| | Bailey Banks & Biddle Jewelers (Bozell) |
| | Big Lots (Initiative) |
| | C&R Clothiers (Asher/Gould) |
| | Checker Auto Parts (Bozell) |
| | Circle K (Initiative) |
| | Circuit City (Asher/Gould) |
| | Factory2You Stores (Asher/Gould) |
| | Family Bargain Center Stores (Asher/Gould) |
| | Fry's Supermarkets (Initiative) |
| | Harris & Frank Clothiers (Asher/Gould) |
| | Hughes Supermarkets (BBDO) |

69

Kennedy's Clothiers (Asher/Gould)

Men's Wearhouse (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

Osco Drugs (Initiative)

Puppy Palace (Ogilvy)

PIP Printers (BBDO)

Ralphs Supermarkets (Initiative)

Safeway Supermarkets (Initiative)

Sainsbury Supermarkets (Silverman LLC)

Sav-On Drugs (Initiative)

Sears (Ogilvy)

Sit 'n Sleep (Silverman LLC)

Stater Brothers Supermarkets (Initiative)

Steuben Glass (Ogilvy)

The Home Depot (Initiative)

Tesco Supermarkets (Silverman LLC)

Tom Thumb Supermarkets (Bozell)

Vons Supermarkets (Initiative)

Wherehouse Records & Tapes (Asher/Gould)

Zale Jewelers (Bozell)

**Social Marketing**

California Department of Health Services – BabyCal (Asher/Gould)

California Department of Health Services – First5 (Asher/Gould)

California Department of Health Services – HIV Prevention (Asher/Gould)

California Department of Health Services – Tobacco-Use Prevention (Asher/Gould)

Los Angeles County Department of Public Health – Tobacco-Use Prevention (Asher/Gould)

Oregon Health Department – Tobacco-Use Prevention (Asher/Gould)

United States Department of Commerce, Census

70

|  | 2000 (Initiative) |
|  | United States Government; Centers for Disease Control – Tobacco-Use Prevention (Initiative) |
|  | White House office of National Drug Control Policy – Drug-use Prevention (Initiative) |
| **Telecommunications** | Nextel (Initiative) |
|  | Telcentris (Silverman LLC) |
|  | Southwestern Bell (Bozell) |
|  | VoxOx (Silverman LLC) |
| **Tobacco** | Tijuana Smalls (Ogilvy) |
| **Tires/Batteries/ Accessories** | Arco (Initiative) |
|  | Goodyear (Ogilvy) |
|  | Shell (Ogilvy) |
| **Toys/Games** | Electronic Arts (Initiative) |
|  | Mattel Electronics (Ogilvy) |
|  | Mattel Toys and Games (Ogilvy) |
| **Travel/Tourism** | Alaska Airlines (Wong Doody) |
|  | Alaska Tourism (Initiative) |
|  | ALM Royal Dutch Airlines (Ogilvy) |
|  | American Airlines (Bozell; Initiative) |
|  | American Express Travel Service (Ogilvy) |
|  | Avis Rent-a-Car (Bozell) |
|  | Bellagio Hotel & Casino (Initiative) |
|  | British Tourist Authority (Ogilvy) |
|  | Cunard Lines (Ogilvy) |
|  | Desert Inn Hotel & Casino (Asher/Gould) |
|  | Disney Cruise Lines (Initiative) |
|  | Disneyland and Walt Disney World (Initiative) |
|  | French Government Tourist Office (Ogilvy) |
|  | Greyhound Lines (Bozell) |
|  | Hyatt Regency Maui (Ogilvy) |

Hyatt Regency Waikiki (Ogilvy)

Hyatt Kuilima Resort (Silverman LLC)

KLM Royal Dutch Airlines (Ogilvy)

Korean Airlines (Ogilvy)

Las Vegas Convention & Visitors Bureau (Initiative)

Loreto Bay (Wong Doody)

Marriott (Ogilvy)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Opryland USA (Ogilvy)

Six Flags (Ogilvy and Initiative)

Trailways Bus Lines (Ogilvy)

Treasure Island Hotel & Casino (Initiative)

TWA (Ogilvy)

United States Travel Authority (Ogilvy)

Universal Studios Hollywood (Ogilvy)

Yosemite National Park and the Curry Company (Ogilvy)

**Utilities**

Bell South (Initiative)

Houston Lighting & Power (Ogilvy)

Nextel (Initiative)

Salt River Project (Bozell)

Southwestern Bell (Bozell)

72

# EXHIBIT C

## EXPERT WITNESS EXPERIENCE

### DEPOSITION, ARBITRATION AND/OR TRIAL TESTIMONY

(2021-2025; Underscore indicates client)

*MAYANNA BERRIN, et al. v. DELTA AIR LINES, INC.*
United States District Court, Central District of California
Case No.: 2:23-cv-04150-MEMF-AS
Deposed 9/30/2025

*NEA VIZCARRA, et al. v. MICHAELS STORES, INC.*
United States District Court, Northern District Of California
Case No. 3:23-cv-00468-PCP
Deposed 1/14/2025

*SARA SAFARI et al. v. WHOLE FOODS MARKET SERVICES, INC., et al.*
United States District Court, Central District of California, Southern Division
Case No. 8:22-CV-01562 JWH-KES
Deposed 1/8/2025

*JENNIFER VLACICH et al. v. DEL MONTE FOODS*
United States District Court, Northern District of California,
Case No. 4:22-cv-00892-JST
Deposed 10/21/2024

*CHARLOTTE WILLOUGHBY et al. v. ABBOTT LABORATORIES*
United States District Court, Northern District Of Illinois, Eastern Division
Case No. 1:22-CV-01322
Deposed 5/14/2024.

*IN THE MATTER OF CERTAIN BLOOD FLOW RESTRICTION DEVICES WITH ROTATABLE WINDLASSES AND COMPONENTS THEREOF*
(On behalf of Complainant)
U.S. International Trade Commission
ITC Inv. No. 337-TA-1364
Deposed 12/19/2023.

*Q INDUSTRIES, INC., v. O'REILLY AUTOMOTIVE, INC., et al.*
United States District Court, Central District of California
Case No.: 2:22-cv-03791-AB-PVCx
Deposed 12/6/2023

*WORLD CHAMP TEC LLC, v. PELOTON INTERACTIVE, INC.*
United States District Court, Northern District of California
Case No. 4:21-cv-03202 SBA
Deposed 3/14/ 2023

*IN RE PLUM BABY FOOD LITIGATION*
(On behalf of Plaintiffs)
United States District Court, Northern District of California, Oakland Division
Case No. 21-cv-00913-YGR
Deposed 3/3/2023

*UNIMED INTERNATIONAL, INC., v. FOX NEWS NETWORK, LLC.*
United States District Court, District of New Jersey
Case No. 2:20-cv-17335-SDW-LDW
Deposed 12/14/2022

*PEOPLE OF THE STATE OF CALIFORNIA v. HOMEADVISOR, INC. and ANGI HOMESERVICES, INC.*
Superior Court of the State of California, City and County of San Francisco
Case No. CGC-18-565008
Deposed 10/11/2022

*DIANA DUKICH et al. v. IKEA US RETAIL LLC and IKEA NORTH AMERICA SERVICES, LLC*
United States District Court for the Eastern District of Pennsylvania
Case No. 2-20-cv-2182-HB
Deposed 6/15/2022

*COURT THOMAS, IN HIS CAPACITY AS RECEIVER AND AS ASSIGNEE, v. SALEM MEDIA GROUP, INC., MARK DAVIS, INSPIRATION MEDIA OF TEXAS, LLC, AND BISON MEDIA, INC.*
County Court at Law No. 3, Dallas County, Texas
Cause No. CC-20-01021-C
Deposed 6/6/2022

*IN THE MATTER OF IN RE: ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION*
(On behalf of Plaintiffs)
United State District Court, Western District of New York
Case No: MDL No. 1:19-md-2903.
Deposed 10/28/2021

*JOSEPH MIER, et al. v. CVS PHARMACY, INC.*
United States District Court
Central District of California
Case No. 8:20-cv-01979-DOC-ADS
Deposed 10/14/2021

*JEFFEY KOENIG and MARCELLUS HOLT, et al. v. VIZIO, INC.*
Superior Court of the State of California, County of Los Angeles
Case No: BC702266
Deposed 10/8/2021

*CHRISTOPHER JULIAN et al. v. TTE TECHNOLOGY, INC. DBA TCL NORTH
AMERICA*
United States District Court, Northern District of California
Case No: 3:20-CV-028570-EMC
Deposed 9/30/2021

*AFSHIN ZARINEBAF et al. v. CHAMPION PETFOODS, et al.*
United States District Court, Northern District of Illinois, Eastern Division
Case No. 1:18-cv-06951
Motion Hearing 9/22/2021

*CARROLL SHELBY LICENSING, INC., and the CARROLL HALL SHELBY TRUST v.
DENICE SHAKARIAN HALICKI, ELEANOR LICENSING, LLC, GONE IN 60 SECONDS
MOTORSPORTS, LLC, et al.*
United States District Court, Central District of California
Case No. 8:20-cv-01344-MCS-DFMx
Deposed 8/24/2021

*DELANEY SHARPE et al. v. GT'S LIVING FOODS, LLC.*
United States District Court, Central District of California
Case No. 2:19-CV-10920-FMO-GJS
Deposed 6/8/2021

*TOYA EDWARDS et al. v. WALMART, INC.*
United States District Court, Central District of California
Case No. 2:18-cv-9655 GW-FFM
Deposed 5/11/2021

*JUSTIN LYTLE et al. v. NUTRAMAX LABORATORIES, INC., et al.*
United States District Court, Central District of California
Case No. 5:19-cv-00835-JBG-SP
Deposed 3/31/2021

76

*REMY SHAKER et al*. *v. CHAMPION PETFOODS USA, et al.*
United States District Court for the Eastern District of Michigan
Case No. 2:18-cv-13603-LJM-DRG

and,

*RACHEL COLANGELO et al. v. CHAMPION PETFOODS USA, et al.*
United States District Court, Northern District of New York
Case No. 6:18:CV-01228-LEK-DEP

and,

*AFSHIN ZARINEBAF et al. v. CHAMPION PETFOODS, et al.*
United States District Court, Northern District of Illinois, Eastern Division
Case No. 1:18-cv-06951
Deposed for three cases above, 3/11/2021