**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

|  |  |
|---|---|
| KEIRA MCCARRELL, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>RUGSUSA, LLC,<br><br>  Defendant. | Case No. 3:25-cv-00454 |

**DECLARATION OF J. MICHAEL DENNIS, PH.D. IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**FEBRUARY 23, 2026**

**REDACTED VERSION**

- 1 -

I, J. Michael Dennis, hereby declare as follows:

1.      I have been retained by counsel for the Plaintiff in the above-captioned matter. If called upon to testify, I would and could testify competently to all such subject matter in this expert report. My compensation, $700 per hour, is not contingent on the results of my work or any outcome of the litigation. My expert opinions expressed in this expert report are solely my own.

### SECTION 1: SUMMARY OF QUALIFICATIONS

2.      I have attached a true and correct copy of my curriculum vitae. **Attachment A** sets forth accurate statements concerning my background, education, training, and experience concerning my expertise in the field of survey research and marketing research. The following summarizes relevant or notable qualifications related to the opinions expressed in this Declaration and Expert Report.

3.      I have worked as a survey research expert for more than 25 years, authoring more than 60 articles, conference and seminar papers, and book chapters. I am recognized as an expert in survey research methods. I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association. In recognition of my expertise in online surveys, I was appointed to the AAPOR Task Force on Online Panels, which published recommendations for researchers.

4.      I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 25 years, including the kind of consumer surveys and analysis described in this report.

5.      Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my clients for more than 25 years. I have designed and conducted consumer surveys that have been accepted by courts in the following cases:

- *Benson v. Newell Brands, Inc.*, Case No. 19-cv-06836 (N.D. Ill.)

- *Price [Miles] v. Philip Morris*, Case No. 00 L 0112 (Circuit Court, Third Judicial Court, Madison County, Illinois)

- 2 -

- *Sunderland v. PharmaCare U.S., Inc.*, No. 3:23-CV-01318-JES-AHG (S.D. Cal.)

- *Favell v. Univ. of S. California*, No. CV 23-846-GW-MARX (C.D. Cal.)

- *Wallenstein v. Mondelez Int'l, Inc.*, No. 22-CV-06033-VC (N.D. Cal.)

- *Cabrera v. Bayer Healthcare LLC*, No. LA CV17-08525 JAK (JPRX)  (C.D. Cal.)

- *Bush v. Rust-Oleum Corp.*, No. 20-CV-03268-LB (N.D. Cal.)

- *Zill v. Sprint*, Case No. RG03114147 (Superior Court of the State of California, County of Alameda)

- *Ebin v. Kangadis Food Inc.*, Case No. 1:13-cv-02311 (S.D.N.Y.)

- *Sachs and Alden v. Toyota Motor Corp.*, Case No. BC443701 (Superior Court of the State of California, County of Los Angeles)

- *Avram v. Samsung Elecs. America, Inc. and Lowe's Home Ctrs.*, Case No. 2:11-cv-6973 (KM)(SCM) (D.N.J.)

- *Geanacopoulos v. Philip Morris, USA*, Civil Action No. 98-6002-BLSI (Superior Court for the Commonwealth of Massachusetts)

- *Scotts EZ Seed Litig.*, Case No. 12-CV-4727 (VB)(PED) (S.D.N.Y.)

- *Dzielak v. Whirlpool*, Case No. 12-cv-00090 (D.N.J.)

- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*, Case No. 3:15-CV-02150-RS (N.D. Cal.)

- *Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Grp., Inc., et al.*, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated) (N.D. Cal.)

- *Broomfield, et al. v. Craft Brew Alliance, Inc., et al.*, Case No. 5:17-cv-01027-BLF (N.D. Cal.)

- *Patrick McMorrow, et al. v. Mondelez Int'l, Inc.*, Case No. 3:17-cv-2327-BAS-JLB (S.D. Cal.)

- *Sharpe v. A & W Concentrate Co.*, Case No. 19-cv-00768 (BMC) (E.D.N.Y.)

- *Montera, et al. v. Premier Nutrition Corp.*, Case No. 3:16-CV-06980 RS (N.D. Cal., San Francisco Div.)

- *Sharon Willis, et al. v. Colgate-Palmolive Co.*, Case No. 19-8542 JGB (RAOx) (C.D. Cal.)

- *Anne De Lacour, et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 16 Civ. 8364 (RA) (AJP) (S.D.N.Y)

- *Kimberly Banks, et al. v. R.C. Bigelow, Inc.*, Case No. 20-cv-06208 DDP (RAOx) (C.D. Cal.)

- *Kathleen A. Cadena et al. v. American Honda Motor Co., Inc.*, Case No.: 2:18-cv-04007-MWF-MAA (C.D. Cal.)

6.    I have testified on more than one hundred occasions as an expert witness since 2002, including at deposition or trial during the last twenty-four years. My attached current curriculum vitae (**Attachment A**) lists my testimony at depositions and trials over the last four years.

7.    The research I have conducted throughout my career has met the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation. I have been the principal investigator for studies funded by the U.S. National Science Foundation. My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

8.    From 2014 until July 2025, I was a Senior Vice President at NORC in Chicago, IL. I founded and led the online panel survey research business for NORC.[1] I founded the AmeriSpeak business unit at NORC (launched publicly in January 2015) and served as its executive director for its first 11 years, growing the business from zero employees and zero revenue to a $30M operation with approximately 80 professional staff members. As Executive Director, I was responsible for all aspects of starting the business unit, including the design and execution of the construction of the AmeriSpeak Panel, which consists of approximately 50,000 U.S. households pre-recruited to participate in online surveys. In addition, I oversaw approximately 200-300 surveys per year conducted using the AmeriSpeak Panel. The surveys were conducted for sponsors

---

[1] NORC is one of the premier survey and social science research organizations in the United States. Affiliated with the University of Chicago, NORC has conducted research for federal, foundation, and academic clients for over 80 years, and is responsible for some of the most prestigious survey projects in the United States, including the General Social Survey and the Survey of Consumer Finance.

in government, academia, media, non-profit policy organizations, membership groups, and private-sector companies. AmeriSpeak is the primary sample source for polls conducted by The AP-NORC Center for Public Affairs.

9.  To illustrate the types of surveys that AmeriSpeak conducted for clients during my 11-year tenure as Executive Director of NORC's AmeriSpeak unit, I note here that I was NORC's Project Director for two significant studies regarding the 2020 general elections in the U.S.

10.  First, I was the NORC Director for the *2020 Facebook Election Research Project*. While funded by Facebook, the study is being directed by university-based academics. I directed all aspects of sampling and survey data collection across five waves of a longitudinal study of approximately 300,000 U.S. adults, with surveys conducted both before and after the November 2020 general elections. The study provided statistical evidence on the extent to which, if any, social media affects our U.S. politics, democratic institutions, and elections.

11.  Second, I was also the NORC Director for the *America in One Room* (A1R) project in the fall of 2019 (prior to the start of the primary elections that led up to the 2020 general election in the U.S.). (I also directed the *America in One Room* project in preparation for the 2021 Glasgow Summit on Climate Change.) The 2019 AIR project, funded by the Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University, researched the extent to which small group deliberations and impartial policy debriefings can result in a convergence in voters' policy preferences (and therefore reduce the prevalence of political divisions in our country). The 2019 deliberative polls were chronicled in a special pull-out section of The New York Times on October

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

2, 2019 (Sunday edition).[2] I was interviewed by CNN, The New York Times, other media outlets, and a film documentary director.

12.    In the 2020-2021 timeframe, my research focus was in directing more than twenty survey studies related to Covid-19 for the U.S. Centers for Disease Control and Prevention, AARP, Boston University, and other organizations. I also led NORC's initiative to create a partnership agreement with AARP, resulting in the June 2021 launch of Foresight 50+ research solutions.[3]

13.    During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conducted health, economic, social, and political research. When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability based KnowledgePanel, which was the core company asset for Knowledge Networks. As part of the launch of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

14.    In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks. In the role of Managing Director, I grew the business to become the company's largest unit in terms of revenue and net income. In building the business, I developed and implemented the business strategy and led development for key client accounts. I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis. I grew the Government & Academic Research business unit from zero employees and zero revenue to over 50 professional staff members and $35M in revenue by 2012.

---

[2] *See* https://en.wikipedia.org/wiki/America_in_One_Room. Badger, Emily; Quealy, Kevin. "These 526 Voters Represent All of America. And They Spent a Weekend Together". The New York Times. Retrieved 2 October 2019. President Obama recommended The New York Times article in a tweet.

[3] https://www.norc.org/Research/Capabilities/Pages/Foresight50.aspx.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

15.     Before joining Knowledge Networks in early 2000, I was a Senior Scientist at Abt Associates, which was and still is one of the country's leading social science research firms. While at Abt Associates (from 1992 to early 2000), I was responsible for managing statistical surveys for U.S. federal agencies. From 1997 to early 2000, I managed the data collection for the largest random-digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for Health Statistics. I also led other survey studies funded by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the Social Security Administration, and the White House Office of National Drug Control Policy.

## SECTION 2: BACKGROUND

16.     I understand that this is a "false reference price" case, meaning that Plaintiff alleges that Defendant advertised falsely-inflated regular/list prices on its website, rugsusa.com, which in turn implied misleadingly large discounts (the "Challenged Conduct").[4]  The regular prices are false, according to Plaintiff, because they do not represent the price at which Defendant actually sells the product. As a result, the savings displayed are false. Plaintiff and those similarly situated were harmed because Defendant artificially increased the regular price of its products, inducing Plaintiff to pay more for rugsusa.com products based on a false impression of their value.[5]

17.     For example, Defendant consistently advertises a sitewide discount on its products, offering "X%" off the regular prices, even though in actuality, Defendant runs these discounts consistently. Defendant prominently claims these discounts "LIMITED TIME ONLY" or by other phrasing, communicating that the offer will expire soon.

18.     Defendant used a variety of techniques to communicate false discounting. In

---

[4] Dkt. 1, Class Action Complaint, Case No.: 3:25-cv-00454-AB, Filed 03/17/25, ¶¶ 2-7. I understand that Defendant does not operate brick-and-mortar stores. Defendant RUGSUSA, LLC's Supplemental Responses to Plaintiff's First Set of Interrogatories, p. 16.
[5] *Ibid.*, ¶ 7.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

addition to sitewide discounting, Defendant's advertising showed the struck-through ("crossed-out") **reference price** (*i.e.*, the "regular price" or "list price"), the **web price** (*i.e.*, the  price after the discount is applied to the regular price), and the **discount percentage**, as shown in the examples below.[6] In the example below, the regular price is $89.99, the web price is $49 and the discount percentage is 46%.

**Exhibit 1: Example of Defendant's Marketing with the Challenged Conduct**



**Regular Price**[7]     **Web Price**[8]          **Discount off Regular Price**

**Exhibit 2: Example of Defendant's Marketing with the Challenged Conduct**



**Web Price  Regular Price     Discount off Regular Price**

19.     Defendant also offers sitewide discounts on top of discounts already made to the false regular price. Defendant routinely runs sitewide discounts that involve promotions that apply

---

[6] Accessed from rugsusa.com on February 3, 2026.

[7] "Regular Price" or "regular price" is the allegedly false reference price reflecting false discount.

[8] When the Challenged Conduct is operative by use of false discounting applied to a specific product, the "Web Price" or "web price" is the price reflecting the false discount. When the Challenged Conduct is not operative via a false sitewide discount, the "Web Price" is the same as the take-home price.

to all sales at rugusa.com (while the promotion is running). The alleged deception can take the form of an advertisement with an initial discount applied to a crossed-out regular price (e.g., "$42 $70"), and then applying an additional sitewide discount to the web price at check out. In another form of the alleged deception, the sitewide discount is applied to a web price that does not have a false reference price. In both cases, the web price is not the take-home price since the sitewide discount reduces the web price further at check out.

**Exhibit 3: Defendant's Use of Discounting Using Strike-out Pricing Plus Additional Discounting at Check Out**



DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

20.     Exhibit 4 documents the three types of alleged deception, described above, with the "cured" advertisement for each. When the sitewide promotions are operative, the "cured" ad is the same as the price paid at check-out in the deceptive scenarios.

**Exhibit 4: Descriptions of Challenged Conduct and Associated "Cures"**

| | False Reference Price Only | False Reference Price + Sitewide Promotion | Web Price (No False Reference Price) + Sitewide Promotion |
|---|---|---|---|
| Challenged Conduct | **$80** $100 | **$80** $100 <br><br> $64 AFTER ADDITIONAL DISCOUNT | **$80** <br><br> $64 AFTER ADDITIONAL DISCOUNT |
| "Cured" Ad | $80 | $64 | $64 |

## SECTION 3: ASSIGNMENT

21.     A hypothesis is a starting point in designing a research project. By stating the hypothesis to be evaluated, the research expert can design and execute a scientific, impartial research project to test it.

22.     My assignment involves evaluating whether it would be feasible to devise a method for conducting a market research study that can be used to reliably measure whether and to what extent class members overpaid, if anything, for the Products because of the Challenged Conduct, which involves the consistent use of false reference pricing and false discounts.

23.     With respect to estimating any overpayment statistics solely attributable to the Challenged Conduct, as a testifying expert retained by the Plaintiff, I work from the assumption that my task is to "proceed on the hypothesis that the Defendant committed the harmful act and

that the act was unlawful."[9]

24.    Plaintiff's Counsel asked me to propose a methodology that can answer two questions.

> Did Defendant's Challenged Conduct cause "reasonable consumers" to attribute additional value to Defendant's Products with inflated regular prices and discounts?

> If so, by how much did the Challenged Conduct cause proposed class members to overpay (*i.e.*, pay more than they would otherwise) for Defendant's Products?

25.    Therefore, my working hypothesis (which I will evaluate impartially and with scientific methods) is that class members overpaid for the Products because of Defendant's use of false reference prices and false discounts.

26.    The objective of the proposed survey and analysis is to ascertain what economic value, if any, a reasonable consumer of rugsusa.com Products place on a false discount attribute.

27.    Estimating a false discount is different from estimating a true discount because a true discount of $1 saves the consumer $1 off the purchase price of a product. But that is not the case for a false discount. A false discount does not actually reduce the purchase price of an item; rather, it inflates the regular/list price to make the item appear discounted.

28.    If consumers had perfect information, their economic valuation of a false discount would be near zero, as a consumer's valuation of a product would likely not be materially influenced by its regular/list price. But consumers do not have perfect information. Many consumers perceive price as a proxy for quality, with a higher price communicating higher quality. As a result, some consumers are likely to place economic value on a false, inflated discount because they infer that a product with a high regular/list price and a discount might be of higher quality than one with the same price but no discount.

---

[9] Allen, M., Hall., R., and Lazear, V. 2011. "Reference Guide on Estimation of Economic Damages," in <u>Reference Manual on Scientific Evidence</u>, Federal Judicial Center, National Research Council of the National Academies, pp. 425-502, p. 432.

29.     I have professionally engaged with this assignment to design a research project that relies on generally accepted methodologies for providing the Court information needed to assess the extent to which, if any, the proposed classes were harmed due to Defendant's use of false reference pricing and false discounting.

30.     I understand that my Conjoint Survey, if and when conducted, will be a source of data for Mr. Colin Weir, Plaintiff's expert in economics, who will calculate the amount of any economic damages suffered by class members that is specifically attributable to the Challenged Conduct.

31.     **Attachment B** is my List of Considered Materials referencing the documents that I considered in creating this declaration and expert report. Citations to additional materials are made in the main body of my expert report.

32.     I do not offer any opinions about the merits or characteristics of the Products themselves (*e.g.*, whether in fact the reference prices marketed by Defendant are false).

### SECTION 4: CONCLUSIONS

33.     I conclude that I have specified a reliable choice-based conjoint survey and analysis to isolate any price premium solely attributable to Defendant's use of false reference pricing and false discounts. My proposed approach for conducting a price premium survey – a choice-based conjoint survey or simply "Conjoint Survey" – is typical of, and generally accepted by, experts in the field of consumer market research.

34.     Based on my past experience in conducting conjoint surveys and my understanding of the relevant peer-review academic literature, I have proposed a reliable methodology and analysis in terms of sampling the relevant universe, administering the Conjoint Survey to appropriately selected consumers, designing the survey and selecting the appropriate attributes for the choice exercises, testing the survey questionnaire, collecting the data, preparing the data for

analysis, and conducting a price premium analysis.

35.     My market-simulation analyses will estimate reliably what the prices of the Products would have been "but-for" the harmful act (that is, Defendant's use of allegedly false reference pricing and false discounts) and then compare those "but-for" prices to the actual prices paid by class members.

**SECTION 5: DEFINITION OF THE PROPOSED CLASSES**

36.     I understand from Plaintiff's counsel that they seek to certify the following proposed class:

> **Oregon Class.** All persons who, while in the state of Oregon and within the applicable statute of limitations period, purchased one or more RugsUSA Products advertised at a discount on Defendant's website on or after October 13, 2023.[10]

**SECTION 6: THE SAMPLE DESIGN FOR THE CONJOINT SURVEY**

37.     The sample design involves the process whereby a representative sample of the target population is identified for the substantive survey, in this case, the Conjoint Survey. I have created a sampling plan to identify and survey respondents whose responses can be generalized to the proposed classes.

38.     In designing the sample for my proposed Conjoint Survey, I considered Defendant's documents made available during discovery, such as Defendant-commissioned market research, and considered best practices in conducting surveys in the litigation context.[11] I also considered various textbooks from the field of survey research, such as Survey Methodology (Second Edition) by Robert Groves *et al*.;[12] Handbook of Survey Research (Second Edition) edited

---

[10] *McCarrell v. RugsUSA*, LLC, 3:25-cv-00454-AB, Dkt. No. 1 (D. Or.).

[11] My screening approach is consistent with Professor Diamond's guidelines published in Shari Seidman Diamond, 2011, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (Third Edition). *See* Attachment B ("Reliance List") for relevant citations to Defendant's documents made available during discovery.

[12] Groves, Robert M., Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. 2011. Survey Methodology (Second Edition). John Wiley & Sons.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

by Peter Marsden and James Wright;[13] Asking Questions by Norman Bradburn *et al.*;[14] The Psychology of Survey Response by Roger Tourangeau *et al.*;[15] Questions and Answers in Attitude Surveys by Howard Schuman and Stanley Presser,[16] among other survey research methodology books. I also considered Defendant's market research, which showed that Defendant's products were distributed by and sold through national retail chains using uniform pricing and marketing strategies.[17]

39.    I determined that the appropriate operational definition for the target population for my proposed conjoint survey consists of consumers who (i) purchased Defendant's at-issue Products during the class period or from Defendant's competitors or (ii) would consider purchasing Defendant's at-issue Products or those of their competitors during the next six months.[18]

40.    Accordingly, my survey will select respondents who purchased, since 2023, one or more RugsUSA Products advertised at a discount on Defendant's website or from a competitor.

41.    By including consumers who would consider purchasing the at-issue Products or those competing with them, my survey will include respondents who are in a "purchase mindset," that is, consumers who are in a frame of mind of considering relevant products.

42.    To facilitate subgroup analyses, I will collect data from respondents about their purchase behavior with respect to the products, such as past purchases made of the Defendant's

---

[13] Marsden, Peter V. and James D. Wright. 2010. Handbook of Survey Research (Second Edition). Emerald Group Publishing.

[14] Bradburn, N. M., Sudman, S., & Wansink, B. 2004. Asking Questions: A Practical Guide to Questionnaire Design. San Francisco: Jossey-Bass.

[15] Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press.

[16] Schuman, Howard and Stanley Presser. 1981. Questions and Answers in Attitude Surveys.

[17] Defendant used uniform line pricing of its products in the U.S. and nationwide product positioning and sold its products through its own national purchase channel – RugsUSA.com. *See* Attachment B ("Reliance List") for relevant citations.

[18]

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

products and competing products, purchase frequency, and the price paid for the most recent purchase of a rug.

43.    To qualify for my proposed Conjoint Survey, respondents will answer a series of screening survey questions to ensure that they qualify as members of the target population. To qualify, respondents' answers are required to meet all of the following conditions:

- Reside in the USA.

- Be an adult age 18 and older.

- Has purchased one or more new at-issue indoor and washable rug Products or competing products for personal use since 2023 (consistent with the start of the proposed class period).[19]

- Would consider purchasing one or more new at-issue indoor and washable rug Products or similar competing products for personal use in the next six months.[20]

44.    In addition to the substantive screening questions noted above, respondents will also be required to answer the following quality control questions in order to qualify for the Conjoint Survey:

- Pass a reCAPTCHA test to assure that the study participant is not a bot (protecting against fraud and fake users).

- Respond that they did not take a survey in the past 30 days about "rugs/carpets."

- Respond that they did not work for or have a family work for in the past 12 months a "a company that makes or sells rugs/carpets."

- Confirm their understanding of the subject matter of the survey (asked to identify and screen out inattentive respondents).

- Pass an "attention check" question, designed to identify and screen out inattentive respondents).

---

[19]

[20] *Ibid.*

DECLARATION OF J. MICHAEL DENNIS                                    Case No. 3:25-cv-00454

- Fail to select a fictitious brand (inserted to identify and screen out inattentive respondents).
- Agreed to certain conditions, listed below:
  - ✓ Answer the questions with your honest answers and opinions. Do not guess.
  - ✓ Answer the questions by yourself and without asking anybody else in your household for help.
  - ✓ Answer the questions without getting help from a website or other materials.
  - ✓ Answer all the questions in one sitting and not stopping in the middle.

45.    **Steps Taken to Disguise Survey Objectives from the Respondents in the Screening Survey.** In designing the screening survey, I will appropriately disguise my research objectives from respondents so they cannot infer them or the research's purpose. Therefore, my survey respondents will be "blind" to my research objectives and, therefore, will not be biased in answering my survey questions.[21]

46.    To disguise the survey objectives, the screening portion of the survey will include a variety of screening questions with no salience or emphasis brought to the products marketed by Defendant. For instance, I will ask questions related to respondents' personal characteristics: State of residence, gender, and educational attainment. My screener will include questions about purchases of other products, not just those related to bedding and household goods.

47.    By casting a wide net of survey questions about various topics and demographic characteristics, I will hide the research objectives from the respondents during the administration of the screening questions.

---

[21] My proposed survey will be in compliance with Professor Diamond's guideline that "any potential bias is minimized by having interviewers and respondents blind to the purpose and sponsorship of the survey…." Professor Shari Seidman Diamond, 2011, "Reference Guide on Survey Research," <u>Reference Manual on Scientific Evidence</u> (Third Edition), p. 374.

## SECTION 7: SURVEY PROGRAMMING, SURVEY PARTICIPANT RECRUITMENT, AND DATA COLLECTION OPERATIONS

48.  In this section, I will describe operational aspects of how I will conduct the Conjoint Survey.

49.  To identify my actual survey respondents and administer the Conjoint Survey, I will retain the online market research company named Dynata. I have retained this firm for my previously mentioned consumer perception, materiality, and price premium surveys conducted in the litigation context. Dynata was created from the merger of two industry-leading online survey sample companies (Research Now and Survey Sampling Inc.). Dynata will provide me with online survey vendor services for questionnaire programming, respondent sample selection, and survey data collection. Based on my industry experience, the Dynata online panel sample is among the most credible and reliable non-probability online panels, with the necessary scale for this study, which involves collecting a substantial number of interviews from qualified consumers who meet all sample selection criteria.

50.  Dynata uses a "click-balance" approach to ensure that the respondents starting my survey constitute a representative sample of consumers with respect to age and gender. After the representative sample began the survey, the screening portion identified qualified and eligible respondents, who were then selected and administered the survey.

51.  Dynata uses digital fingerprinting that creates a "fingerprint" for each respondent based on computer characteristics (like IP addresses). Fingerprinting helps to identify respondents who attempt to take the same survey more than once. Fingerprinting is also useful for excluding respondents who, in other surveys, showed a pattern of inattentiveness. Dynata will also provide me with date/time stamp information on survey-taking at the respondent level, so that I can conduct sensitivity tests based on interview length, enabling me to remove interviews from the analysis if their length indicates that their survey responses are not reliable.

52.  Dynata will not conduct any analyses of the data as my survey administrator.

53.  Dynata will work under my supervision and control. I will not share the research objectives with Dynata. Dynata will be "blind" to the research objectives of the study and "blind"

to the sponsor of the study.

### SECTION 8: SUMMARY OF THE PROPOSED METHODOLOGY FOR CALCULATING ANY OVERPAYMENT SOLELY ATTRIBUTABLE TO DEFENDANT'S ALLEGED DECEPTION

54.     My proposed Choice-based Conjoint Survey will provide reliable information for estimating any overpayment resulting from Defendant's Challenged Conduct. The conjoint survey will be designed to provide statistical estimates of overpayment for the alleged deception by providing respondents with the opportunity to select products for purchase with (i) various false reference prices and discounts and (ii) those without a false reference price or discount (*i.e.*, simply a web price without an accompanying reference price and discount), as shown in the example below of an allegedly deceptive and "cured" web ad. The advertisement, after curing the alleged deception, does not display a false reference price or a false discount.[22]

**Exhibit 4: Comparison of Allegedly Deceptive and "Cured" Advertisements**

| Allegedly Deceptive Advertisement | "Cured" Advertisement |
|---|---|
| Perfect Handwoven Jute-Blend Rug ★★★★☆ 1,705 ~~$89.99~~ $49 (46% OFF) ⓘ \| Free Shipping | Perfect Handwoven Jute-Blend Rug ★★★★☆ 1,705 $49 ⓘ \| Free Shipping |

55.     In addition, the Conjoint survey will also be designed to provide statistical estimates

---

[22] Using standard methodology in test and control group/experimental surveys, the deception is "cured" by removing the allegedly deceptive elements (*i.e.*, the "~~$89.99~~" and the "(46% OFF), and leaving in place "**$49**." For the presentation of pricing in my proposed conjoint survey, I changed the red font used for the cured price (*i.e.*, $49) to a black font to conform with how rugusa.com presents the web/take-home price when there is no discount. "In the simplest version of such an experiment, respondents are randomly assigned to one of two conditions. For example, respondents assigned to the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial." S.S. Diamond. 2011. "Reference Guide on Survey Research." In <u>Reference Manual on Scientific Evidence</u>, Federal Judicial Center, National Research Council of the National Academies, p. 398.

of overpayment resulting from Defendant's use of allegedly deceptive sitewide discounts. When this form of price discounting occurs, it happens at the check-out stage. The sitewide discounts reduce the advertised Web Price.

56.    I am prepared to conduct this conjoint survey and analysis, as described below, if requested by Plaintiff's counsel. I have already specified the core of the draft questionnaire, including the attributes and levels that will make up the conjoint design, and I have already tested the draft conjoint survey with focus group participants.

## SECTION 9: DESCRIPTION OF THE PROPOSED METHODOLOGY FOR CALCULATING ANY OVERPAYMENT SOLELY ATTRIBUTABLE TO DEFENDANT'S CHALLENGED CONDUCT

57.    Economic theory posits that people attempt to maximize their expected utility.[23] My choice-based conjoint survey and analyses will be based on this fundamental economic theory. The Challenged Conduct is theorized to increase individuals' utility relative to its absence in Defendant's advertising. Put plainly, Plaintiff argues that the price paid by RugsUSA purchasers for the Products would have been lower if Defendant had not displayed false reference prices and false discounts. All members of the proposed class(es) were alleged to be harmed because they purchased the Products at given prices, which were allegedly inflated because of Defendant's Challenged Conduct.

58.    The overpayment (if any) attributable to the Challenged Conduct can be determined through one or more choice-based conjoint surveys, which would generate a set of thousands of data points that can be utilized by a market simulator that incorporates real-world demand and supply factors based on both the survey data and independent real world historical information.

59.    Prior to the adoption of choice-based conjoint in marketing research, it was common for researchers to ask respondents to rank and rate new product concepts and features. The pioneering research in econometrics by Professor Daniel McFadden, in particular, resulted in

---

[23] *See* B. Bernheim and M. Whinston, 2008, <u>Microeconomics</u>, New York, NY: McGraw-Hill Irwin, chs. 4-5.

the statistical foundations for choice-based conjoint analysis.[24] Since the 1980s, when microcomputer packages for conjoint analysis became available, the popularity of conjoint analysis accelerated in the field of consumer market research related to consumer goods, industrial goods, financial services, and other fields.[25] Choice-based conjoint, in contrast to ranking and rating methodologies, asks the respondent to express their preferences by choosing from sets of alternative concepts (such as product profiles). In doing so, respondents are asked to make "trade-off" decisions that reveal their real preferences for preferred goods that they would potentially purchase in the real marketplace.[26] As such, the respondent's experience in answering choice-based conjoint surveys is similar to what buyers actually do in the marketplace – that is, choosing a preferred product from a group of products.

---

[24] Professor McFadden was awarded the Nobel Prize in Economics in 1970 for his contributions to the statistical bases that made possible discrete choice statistical methodology. *See* Chapter 4, "A Short History of Conjoint Analysis," in Bryan Orme (2010) Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, (2d Edition). Orme (*id.* at p. 33) explains the appeal of choice-based conjoint analysis as an advance of ranking and rating exercises in the early 1970s – an appeal that has continued to today:

> The concept of choice analysis was attractive: buyers did not rank or rate a series of products prior to purchase, they simply observed a set of available alternatives (again described in terms of conjoined features) and made a choice. From a theoretical and statistical standpoint, choice analysis was more defensible than ratings-based conjoint.

[25] Paul E. Green and V. Srinivasan (1990) "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," Conjoint Analysis in Marketing, American Marketing Association, pp. 3-19.

[26] "The CBC System for Choice-Based Conjoint Analysis," (Aug. 2017) Sawtooth Software Technical Paper Series accessed at https://content.sawtoothsoftware.com/assets/0891a76f-93d3-4838-a38d-8ac0a2cda519 (last accessed Dec. 20, 2024).

DECLARATION OF J. MICHAEL DENNIS | Case No. 3:25-cv-00454

60. Choice-based conjoint, which is the specific methodology I propose to use in this litigation, is the most widely used type of conjoint survey.[27] Over 18,000 conjoint surveys are estimated to take place each year in commercial applications.[28]

61. Conjoint surveys are also used widely in industry and government. While conjoint surveys and analyses have been common in market research since the 1980s for product development and other purposes, they are increasingly used in the public sector. For instance, the Food and Drug Administration uses the approach in regulatory benefit-risk assessments.[29] In another example, public health planners are increasingly using choice-based conjoint analyses to collect public input for health service planning, healthcare finance debates, and the treatment choices of individual patients, among other uses.[30]

62. Conjoint survey and analysis methodology has been widely accepted by courts as being capable of measuring the overpayment associated with challenged labeling representations in false advertising class actions in accordance with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).[31]

---

[27] For technical information about the choice-based conjoint methodology that I propose to use, *see generally* the Sawtooth Software technical papers on choice-based conjoint available at https://sawtoothsoftware.com/resources/technical-papers. *See also* Bryan Orme (2014) Getting Started with Conjoint Analysis: Strategies for Product Design & Pricing Research, Third Edition; Bryan Orme and Keith Chrzan (2017) Becoming an Expert in Conjoint Analysis; and other references listed in Attachment B.

[28] Orme (2014) at p. 143. Wittink and Cattin estimate that about 400 conjoint analysis applications took place per year in the 1980s. D.R. Wittink and P. Cattin (1989) "Commercial Use of Conjoint Analysis: An Update," Journal of Marketing, 53 (July): 91-96.

[29] F. Reed Johnson, Ph.D., and Mo Zhou, M.A., (2016) "Patient Preferences in Regulatory Benefit-Risk Assessments: A US Perspective", Value in Health, accessed at https://www.valueinhealthjournal.com/article/S1098-3015(16)30431-4/fulltext? (last accessed Dec. 20, 2024).

[30] Charles E. Cunningham, *et al.*, "Adaptive Choice-Based Conjoint Analysis: A New Patient-Centered Approach to the Assessment of Health Service Preferences", The Patient: Patient-Centered Outcomes Research, accessed at https://link.springer.com/article/10.2165/11537870-000000000-00000 (last accessed Dec. 20, 2024).

[31] *See, e.g.*, *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the *Daubert* considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); *In re: Lenovo Adware Litig.*, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) (certifying class where damages model was based on conjoint analysis); *In re ConAgra Foods,*

---

63.     I have employed choice-based conjoint survey methodology in previously conducted surveys that have been accepted by courts.[32]

64.     My proposed use of conjoint surveys and analyses in this litigation follows generally accepted practices in its use in the litigation context, in my expert opinion.

65.     Specifically, choice-based conjoint is a standard marketing research technique for quantifying consumer preferences for products and for the component features that make up a product.[33] Conjoint analysis can be used to break down the value of a product, such as a car, smartphone, or consumer packaged goods, into its component parts (such as brand, features, price, *etc*.).

66.     Conjoint surveys take advantage of the fact that consumers are profoundly familiar with the task of shopping – comparing products, evaluating them, and making choices. Consumers are accustomed to making choices in their real-world shopping experiences. An industry leader in conjoint analysis tools observes:

> Choice-based conjoint analysis has attracted much interest in the marketing research field. There are several reasons for its position as the most widely used

---

*Inc.*, 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); *Guido v. L'Oreal USA, Inc.*, 2014 WL 6603730, at *4-8 (C.D. Cal. July, 24, 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of *Comcast*); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-26 (N.D. Cal. 2013) (denying motion to exclude conjoint analysis) *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012) (conjoint analysis survey was "admissible as relevant under FRE 401 and 402 and . . . sufficiently reliable under FRE 702 and *Daubert*"); *see also Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. Mar. 13, 2014); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

[32] *See, e.g., Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,* 326 F.R.D. 592 (N.D. Cal. 2018), *McMorrow v. Mondelez Int'l, Inc.,* No. 17-CV-2327-BAS-JLB, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021), *Sharpe v. A&W Concentrate Co.,* No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021), and *Cadena v. American Honda Company*, No.: 2:18-cv-04007-MWF-MAA.

[33] Orme, 2014. "Conjoint analysis broadly refers to any decompositional method that estimates the structure of a consumer's preferences (*e.g.*, part worths, importance weights, ideal points) given his/her overall evaluations of a set of alternatives that are pre-specified in terms of levels of different attributes." *See* P. Green and V. Srinivasan, 1978, "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5, pp. 103-123.

conjoint-related approach today: The task of choosing a preferred concept is similar to what buyers actually do in the marketplace. Choosing a preferred product from a group of products is a simple and natural task that everyone can understand.[34]

67. In a conjoint survey, survey participants are presented with a "choice exercise" or "choice task" in which they are typically shown a set of 3 or 4 hypothetical products (technically called "product concepts" or "product alternatives") and asked to choose which of the products, if any, they would purchase. The hypothetical products in conjoint surveys are typically comprised of "attributes" that reflect features that consumers consider in making purchasing decisions.[35] For consumer-packaged goods, attributes that consumers typically consider in their purchasing decisions include things like product brand, packaging claims, product size and, of course, price.

68. For each attribute, there are various "levels." For example, if a conjoint survey was

---

[34] Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis," p. 2.

[35] Most textbooks and authorities in conjoint surveys recommend a maximum of six to eight attributes. My design has seven features presented to respondents. In designing the structure of my conjoint survey and the selection of attributes, I took care to limit the number of tested attributes in consideration of the literature indicating that data quality can suffer when using too many attributes. There is not a consensus among conjoint analysts about the maximum number of attributes beyond which a researcher should not go because there are too many factors in play to have a concrete rule. The key insight from the literature is that the researcher should include only those attributes that are essential for managerial decision making and to create realistic product concepts because adding non-essential attributes can reduce the quality of responses. "In our experience, respondents have a difficult time dealing with more than about six attributes in full-profile conjoint method…. When faced with too much information, respondents often resort to simplification strategies to deal with the difficulty of the task. Unless respondents employ the same sort of simplification strategies when making real-world decisions, full-profile results may place too much emphasis on the few most important features." Bryan Orme, 2002, "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software Research Paper Series. Orme and Chrzan later wrote that "there isn't anything magical about the number six when it comes to the maximum number of attributes" because there are other factors that matter, such as respondents' familiarity and engagement with the product category." Bryan K. Orme and Keith Chrzan, 2017, Becoming an Expert in Conjoint Analysis, p. 84. *See also* E. Ofek and O. Toubia, August 4, 2014, "Conjoint Analysis: A Do It Yourself Guide," Harvard Business School also warn against the temptation "to end up with a list of attributes that is too long" (p. 2). The authors recommend that the conjoint expert should focus on the attributes that "have the potential to sway consumers' choices and can actually be changed or controlled by the firm." The authors argue that it is sometimes best to leave out "must-have attributes" and instead instruct the respondents to assume that some attributes are held constant across the products shown in the conjoint survey (p. 2).

considering golf balls, attributes might be model and brand, performance, and price.[36] The levels of the brand attribute might be "Pro V1, by Titleist," "Eclipse+, by Golfers, Inc.," "Long Shot, by Performance Plus," "RZN by Nike," and "High-Flyer, by Smith and Forester." The levels for the performance attribute might be that the ball drives 20 yards farther than the average ball, 15 yards, 10 yards, 5 yards, or 0 yards.

69.     The levels for each attribute are systematically randomized so that the presented hypothetical product choices have a mix of products with different combinations of attribute levels. Therefore, one choice exercise presented to respondents might look like the following example from Sawtooth.

**Exhibit 5: Sawtooth Example of a Standard Choice-Based Conjoint Task Displayed to Respondents**



---

[36] The example here comes from Sawtooth Software Technical Paper Series. Sawtooth is one of the leading software providers for market simulators for conjoint analysis and is considered a leading authority regarding conjoint analysis. *See* Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis," p. 9.

- 24 -

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

70.    Based on respondents' choice of a specific product (or selecting no product), their preferences for specific attributes and the attribute levels are revealed. By having each survey respondent repeat the choice task 12 to 16 separate times (each with a unique set of products with systematically varied levels of the attributes) and having a statistically significant number of survey respondents (typically in the hundreds), the choices made by survey respondents provide thousands of data points from which the market price differential attributable to a particular attribute can ultimately be determined.

### SECTION 10: SURVEY DEVELOPMENT

71.    I designed the conjoint survey, which I included in the Discussion Guide for the Focus Groups (**Attachment C**), to ensure that my conjoint analysis would be based on reliable information. In designing the conjoint survey, I used generally accepted practices in the marketing sciences and survey research industries.[37] I used neutral, even-handed, unbiased, non-alarmist language throughout my survey. I provided non-leading survey question wording in my instructions and context-setting for the respondents, and in the conjoint survey itself. I provided balanced and complete survey response options. I established a neutral marketplace context for consumers to make their choices among the product concepts (sometimes called "product alternatives") in my conjoint survey. I randomized the order of certain attributes and levels to avoid potential order bias. I provided respondents with a "no buy" option in case none of the product concepts are acceptable. I provided no information that would enable respondents to identify the research objectives or the sponsor. Respondents, therefore, were incapable of providing strategic responses or answers motivated to "please" the researcher.

72.    **Focus Groups in Support of Survey Development.** I conducted focus groups as a means for testing the draft conjoint survey questionnaires. As I will explain further later, I propose to have two conjoint surveys – one for small area rugs at lower price points and another for larger area rugs with higher price points. I personally conducted the focus groups, asking respondents for feedback on my survey.

---

[37] Peter Marsden and James Wright, (2010) Handbook of Survey Research (2d Edition); Norman Bradburn *et al.*, (2004) Asking Questions (2d Edition).

- 25 -

73.   In my practice, I routinely conduct qualitative research, such as focus groups, because it is a best practice for survey questionnaire development.[38] I conduct the qualitative research because the survey respondents are the ultimate judge of whether the survey questions are clear, unbiased, and make sense to them as consumers. To prevent error in surveys, qualitative research based on focus groups and/or cognitive interviewing is the gold-standard methodology for testing survey questionnaires with respondents.[39] Both approaches provide the researcher with opportunities to hear directly from respondents about their experiences participating in the research.

74.   Qualitative research methods like focus groups and cognitive interviews are a much more involved and thorough procedure than simple "pretesting," which does not involve any question-by-question conversation with respondents about their thought processes in forming and reporting answers to survey questions.

---

[38] Professor Diamond notes that "Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions." S.S. Diamond. 2011. "Reference Guide on Survey Research." In Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council of the National Academies at p. 388. My methodology for administering the focus groups is similar to those used in cognitive interviewing. According to one of the foremost experts in cognitive interviewing, Gordon Willis and his co-author:

> Cognitive interviewing is an evidence-based, qualitative method specifically designed to investigate whether a survey question—whether attitudinal, behavioral, or factual in nature—fulfills its intended purpose. The method relies on interviews with individuals who are specifically recruited. These individuals are presented with survey questions in much the same way as survey respondents will be administered the final draft of the questionnaire. Cognitive interviews are conducted before data collection (pretesting), during data collection, or even after the survey has been administered, as a quality assurance procedure.

*See* Gordon B. Willis and Anthony R. Artino, Jr., "What Do Our Respondents Think We're Asking? Using Cognitive Interviewing to Improve Medical Education Surveys." J Grad Med Educ. 2013 Sep; 5(3): 353–56.

[39] Gordon B. Willis (2005) Cognitive Interviewing: A Tool for Improving Questionnaire Design. Cognitive interviews are used extensively by the U.S. federal government in developing surveys for official statistical surveys. "Cognitive Interviewing", Center for Disease Control, accessed at https://www.cdc.gov/nchs/ccqder/question-evaluation/cognitive-interviewing.html (last accessed Dec. 20, 2024).

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

75.    The focus groups allowed me to collect respondents' feedback on the conjoint survey that I will ultimately field (collecting the data on which I will rely to calculate the final overpayment percentages).

76.    To conduct the focus groups, I recruited adult research subjects who had purchased one or more indoor area rugs for personal use in the past 24 months. I conducted four focus groups in total. I conducted the focus groups on February 8, 2026, with 6, 4, 6, and 5 participants. The focus groups lasted 40-45 minutes. I paid participants $40 for their time.

77.    I developed a "Discussion Guide" (see **Attachment C**) that I presented to respondents via Zoom. The discussion guide allowed me to show participants a draft of my conjoint survey questionnaires. The draft questionnaires explained the context of the survey, the assumptions that the survey is asking respondents to make and described the product attributes. The draft questionnaires also included mock-ups of three choice tasks, which I made using Microsoft Excel, for each of the two conjoint surveys (for a total of six choice tasks).

78.    After showing the participants the draft conjoint surveys one screen at a time, I "debriefed" the participants by asking the following questions during the discussion period, as documented in the discussion guide. The debriefing was my opportunity to learn directly from the participants about their experience in participating in my conjoint survey. I asked the participants the following questions:

- Were the survey questions written clearly?

- Were the choices in the survey realistic?

- Did you answer the survey questions like you would when considering an actual INDOOR AREA RUG product for purchase?

- How do you initially go about thinking about which rugs you are going to consider for purchase? How do you initially group the rugs for comparison?

  Is it by:

  - Rug Size
  - Style
  - Pattern
  - Price
  - Something else?

DECLARATION OF J. MICHAEL DENNIS                                    Case No. 3:25-cv-00454

- Were there any other features that should have been in the survey?

- Were the price points in the choices sensible and make sense to you?

- Did the survey give you the information you needed for you to give a complete response?

- Are there any features you need to know more about to make your choices?

- The survey made all the products available to you through a single retailer's website. Did this make sense to you?

- The survey asked you to assume that the products are the same except for the features shown in the survey. Did this make sense to you? Would your choices have been different if the survey had shown more features or were you able to make the assumption?

- Were the survey questions leading or biased in any way?  That is, was the survey trying to get you to answer the survey questions in a certain way?

- Was there anything about the survey that was confusing to you?

- Were the survey questions presented in a format that made it easy or hard for you to answer?

- Which kind of company or organization do you think is paying me to do this survey?

79.     The focus groups confirmed that my conjoint survey is based on the appropriate attributes and that I am not omitting any important purchase drivers; that I should employ two conjoint surveys (one for the smaller rug sizes, and another for the larger rug sizes) because consumers initially compare like-sized rugs when beginning the purchase journey; that, with modest changes to the survey, I can improve the clarity of the description of the attributes; that my conjoint survey provided the appropriate shopping context; and that my survey is non-leading and unbiasing from the respondents' perspective.

80.     Based on feedback I received from my focus group participants, I identified a few areas where the survey can be improved. Below is a list of issue areas and improvements that I will make prior to conducting the survey (if requested by Counsel to conduct the conjoint survey.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

**Exhibit 6: Results from the Focus Group Interview Testing**

| Potential Issue | Findings / Solutions |
|---|---|
| Levels for the "Primary Material" attribute need more explanation. Some respondents commented the terms "Synthetics" and "Jute & Sisal" needed more explanation. | Add brief definitions for the levels for the "Primary Material" feature (*i.e.*, Attachment C, p. 9). |
| Levels for the "Style" and "Pattern" attributes would be clearer with visuals. | For the descriptions of the "Style" and "Pattern" features (Attachment C, pp. 10-11), add exemplar images for each level drawn from the rugusa.com website. In the conjoint choice tasks (Attachment C, p. 16), make accessible a legend for viewing the exemplar images via respondents' clicking on the "Style" and "Pattern" feature names (in the leftmost column). The legend will be available through a pop-up window. |
| Some focus group participants sought to have additional descriptors included in the "Description" attribute. | I already added three additional descriptors to the "Descriptions" attribute because of input from the participants: "Hypoallergenic," "Made in the USA," and "GoodWeave Certified." |

81.    **Pretesting.** In addition to the qualitative research that I have already conducted, I will also "pretest" the conjoint surveys (if asked to conduct the surveys). This step typically occurs after qualitative research is completed and the questionnaire is finalized for fielding to actual survey respondents.

82.    Pretesting is a generally accepted best practice in survey research. Pretesting is essentially a full "dress rehearsal" of the main data collection. The pretest will enable me to determine if there are any operational issues with the survey, as well as identifying any potential user-level issues experienced by respondent as indicated by the survey data (*e.g.*, interview non-completions, high rates of "don't know," "none of these," and other responses indicating that the response options or choice scenarios are incomplete). I propose to collect at least 50 interviews for the pretest for each conjoint survey that I run.

83.    **The Proposed Attributes and Levels for the Conjoint Survey.** I have prepared the structure of the conjoint design for the price premium survey and the draft questionnaire. I have

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

reviewed and considered numerous materials and documents relating to the Products and competitors' products, as shown in **Attachment B** (List of Considered Materials). This review ensures that my conjoint surveys will provide an appropriate model of the real-world marketplace. Reviewed documents include, but are not limited to, market research conducted by Defendant, pricing information, and other documents made available to me through the discovery process, among other documents.[40] I have considered the historical pricing paid by consumers for the Products. Accordingly, I considered supply-side factors and real-world market transaction information from consumer transaction data for the Products.

84.     I designed the conjoint survey by considering best practices by marketing scientists specializing in conjoint surveys and analysis (Green and Srinivasan, 1990; Orme, 2022; Orme and Chrzan, 2017; Sawtooth Software Technical Paper Series, 2009, 2017), among others. I also considered two academic articles related specifically to the application of conjoint analysis to understanding consumers' preferences for carpets.[41]

85.     I propose the following attributes and levels for the conjoint survey. My conjoint design includes the key purchase drivers for consumers considering indoor rugs for purchase. The design ensures that my conjoint survey will produce reliable statistical estimates of any overpayment solely attributable to the alleged deception. My proposed design includes key

---

[40] *See* Attachment B, List of Considered Materials, for references to relevant documents that I have examined. I also considered academic articles on the application of conjoint analysis to evaluate consumers' preferences for carpeting. Rahimi, S. et al., 2014, "Investigation of Customer Priorities for Machine Made Carpet Through Conjoint and Cluster Analysis (Case Study in Yazd, Iran)," International Journal of Business and Development Studies Vol. 6, No. 1, (2014) pp.83-98.

[41] Rahimi, S. et al., 2014, "Investigation of Customer Priorities for Machine Made Carpet Through Conjoint and Cluster Analysis (Case Study in Yazd, Iran)," International Journal of Business and Development Studies Vol. 6, No. 1, pp.83-98. Nurhayati, A. 2019, "Carpet Product Preference using the Conjoint Analysis Method," Journal of Technology Management and Technopreneurship, Vol. 7 No. 1, pp.39-45. Each study has its own specific research agenda. Rahimi et al. focused on a narrow manufacturing sector in Iran for making Persian rugs, with a limited variety of rug products under consideration. Rahimi et al. selected these attributes: Design (specific to Persian rug designs); Color; Number of colors; Primary Material; Density; and Brand. Price was not an attribute. Nurhayati also used conjoint analysis for a practical purpose – to help businesses in Indonesia make decisions about the types of carpet products to manufacture. Nurhayati selected these attributes: Types of color (plain, color pattern), Image type, Shape/Form type, and Size type.

DECLARATION OF J. MICHAEL DENNIS                                Case No. 3:25-cv-00454

purchase drivers, as indicated by the filter categories Defendant used to organize its products on its website (rugsusa.com), while collecting the data necessary to evaluate the Plaintiff's allegations that class members suffered economic harm due to Defendant's Challenged Conduct.

86.    I determined that two conjoint surveys are appropriate to cover smaller versus larger area rugs marketed by Defendant at rugsusa.com. I observed that the 10 most expensive rugs for the 2-by-3-foot size range from $328 to $398, while the 10 most expensive rugs for the 8-by-12-foot size range from $3,260 to $3,998. With respect to the 10 lowest-priced rugs, there was also a large variation: $14.99 for the 2-by-3-foot rugs and $54.99 to $ 69.99 for the 8-by-10-foot rugs.

87.    One potential solution in a conjoint survey in this situation (where price is clearly conditional on product size) is to design a conjoint survey where the price point varies within ranges that are sensible for each product size.[42] For instance, the price range for the 2-by-3-foot rugs could span the observed 10th and 90th percentiles. However, doing so would still leave a very substantial gap in the prices displayed within any given choice task (*e.g.*, in the same choice task, a $50 2x3 synthetic rug could be next to a $5,000 8x10 wool rug). The juxtaposition of extremes could lead to dominated product alternatives, meaning that some product concepts are almost unanimously preferred over other product concepts.[43]

88.    Furthermore, when customers are shopping for a new rug, in my expert opinion, they already have an approximate idea of the size of the rug they want for their living space and will focus on comparing rugs by size (comparing like-sized products). My focus groups confirmed, as documented below, that consumers prioritize rug size when initially considering which rugs to

---

[42] Conditional pricing techniques are discussed by Orme and Chrzan as appropriate when, for example, prices vary as a result of brands and/or package sizes. Orme and Chrzan, 2017, Becoming an Expert in Conjoint Analysis, pp.28-31.

[43] Dominated alternatives are to be avoided in conjoint designs. As explained by Sawtooth in its glossary: "When a product alternative or conjoint card is clearly superior in utility to competing alternatives, this is termed **dominance**. A high degree of dominance within a conjoint or discrete choice questionnaire usually is not desirable. A choice of a dominant alternative is less informative for refining respondent preferences than a more thoughtful trade-off among alternatives wherein there isn't an obvious choice." https://sawtoothsoftware.com/resources/knowledge-base/general-issues/glossary-of-terms. [Last accessed 2/8/2026]  *See also* Orme and Chrzan, 2017, Becoming an Expert in Conjoint Analysis, p. 52. "You will find that avoiding dominated concepts will tend to increase utility balance."

compare and evaluate for purchase.

89. For these reasons, I have determined that it is appropriate to design and conduct two conjoint surveys that can cover various sizes of indoor area rugs sold by Defendant. These indoor rugs, as mentioned, account for approximately 95% of the revenue generated by Defendant's rug sales. For each conjoint survey, the size of the rug will determine the range of prices shown to respondents (not the false reference prices).

90. The conjoint survey for the small-sized carpets will cover the rugs 2x3, 3x5, 4x6, and 5x8 rugs, while the large-sized conjoint survey will cover the 6x9, 8x10, 9x12, and 10x14 rugs. Respondents will be assigned to the small- or large-sized conjoint survey based on their answers to survey questions in the pre-conjoint module, which asks about their purchase interests in indoor area rugs. Respondents having purchase interest in both small and large indoor area rugs will be randomly assigned to one of the two conjoint surveys. By assigning respondents to the appropriate conjoint survey based on self-reported purchase interest, I will ensure it displays relevant product concepts. For each rug size, the web price offered will fall within the 10th and 90th percentiles of observed prices on rugsusa.com, with four pricing levels per rug size.

91. I also observed that web prices tend to be conditional on the primary material used for the indoor rug. For instance, among the 2x3 rugs, the 10 most expensive are made with wool or with jute and sisal. For the 8x10 rugs, the most expensive ones are made from wool. For the low-priced area rugs, I observed a tendency for the primary material to be synthetic.

92. As a result, I propose to further stratify the offered web prices by type of material. 99.8% of the current inventory of rugs at rugsusa.com (as of February 4, 2026) is accounted for by only four primary material types: synthetics (63.3%), wool (21.9%), jute and sisal (8.8%), and cotton (5.7%).

93. For each rug size (*e.g.*, 8x10 rugs), I propose web pricing tiers by material type, so the price range for each size/material type combination will fall between the 10th and 90th percentiles of prices paid nationwide for those products.

94. To illustrate, the pricing range for the 2x3 and 8x10 area rugs could be expected to be approximately as follows, with adjustments to be made by collaborating with Plaintiff's

damages expert, Mr. Colin Weir:[44]

**Exhibit 8: Draft Pricing Web Pricing Ranges for 2x3 and 8x10 Area Rugs by Material Type**

<u>2x3 Area Rugs</u>

| | |
|---|---|
| Synthetics: | $20 to $110 |
| Cotton: | $30 to $140 |
| Wool: | $80 to $400 |
| Jute & Sisal: | $80 to $400 |

<u>8x10 Area Rugs</u>

| | |
|---|---|
| Synthetics: | $60 to $400 |
| Cotton: | $120 to $800 |
| Wool: | $800 to $4000 |
| Jute & Sisal: | $800 to $4000 |

95.     The above discussion of prices regards the <u>web prices</u> that respondents would see in my conjoint surveys. False reference prices reflecting false discounting will necessarily be higher than the web prices.  Check-out prices reflecting false sitewide promotions will necessarily be lower than the web prices.

96.     Because my conjoint surveys would necessarily be conducted to estimate any damages resulting from the Challenged Conduct, it is also necessary to present respondents with rug choices that display (i) false reference price and false discounting and/or (ii) false sitewide promotions.

97.     My conjoint survey will include the <u>regular price attribute</u> (as distinct from the web price) that will either be blank (meaning that there is not a false regular price shown to respondents) or have a dollar value corresponding to various levels of inflated, allegedly deceptive prices. A blank (absent) regular price is needed to run a market simulation that estimates the market-clearing price in the but-for world where the Defendant did not engage in the Challenged Conduct. When

---

[44] Mr. Weir, in my expert opinion, has the necessary expertise and familiarity with relevant data sources to analyze the Circana or other sales transaction data made available through discovery to provide descriptive statistics on the prices paid by combinations of rug size and material type for the at-issue Products. The pricing shown in the example is not finalized and is provided to illustrate the principle of tiered pricing.

DECLARATION OF J. MICHAEL DENNIS                              Case No. 3:25-cv-00454

the regular price is present, I recommend the following levels of inflation applied to the web price to arrive at the regular (allegedly misleading) price: 20%, 30%, 50%, and 70%.[45]

98.    I will base the display format of the regular prices, web prices, and discounts on the conjoint surveys using the model of rugsusa.com. Below is an example from the rugsusa.com website (accessed February 5, 2026):

**$99** ~~$168~~ **(41% OFF)**

99.    As a result, in the context of my proposed conjoint survey, when the regular price in the product concept is <u>present</u> (that is, the Challenged Conduct is operative), the web price and the regular price could look similar to this in the conjoint survey.[46]

**$80** ~~$100~~

100.    When the regular price in the product concept is <u>absent</u>, then only the web price would be displayed in the conjoint survey.[47]

$80

101.    I previously displayed the types of alleged deceptions and their associated "cures." I provide the Exhibit again in the context of documenting the draft expression of pricing options in my proposed conjoint survey for each of the three types of alleged deceptions.

---

[45] On February 5, 2026, Defendant's rugusa.com ran this promotion on its homepage: "Champion's Choice! Up to 70% Off Sitewide." On February 3, 2025, the lowest 10 prices for 2X3 rugs were discounted between 67% and 81%.

[46] I will determine whether to display the false discount percentage after further review of discovery to determine which practice occurred the most often during the class period.

[47] For undiscounted prices (when a false reference price is not displayed), the price is in black font at rugusa.com. The below image was accessed on February 8, 2026 from the "best sellers" page for a non-discounted product.



DECLARATION OF J. MICHAEL DENNIS    Case No. 3:25-cv-00454

**Exhibit 9: Draft Expressions of Pricing in the Proposed Conjoint Surveys (Based on the Use Case of a Rug Initially Priced at $80)**

| | False Reference Price Only | False Reference Price + Sitewide Promotion | Web Price (No False Reference Price) + Sitewide Promotion |
|---|---|---|---|
| Challenged Conduct | **$80** $100 | **$80** $100<br><br>$64 After Additional Discount | **$80**<br><br>$64 After Additional Discount |
| "Cured" Ad | $80 | $64 | $64 |

102.    Therefore, the **price attribute** in my conjoint surveys will be presented to respondents based on Defendant's rugsusa.com website, using price information sourced from a look-up table of web prices for products of varying rug size and material type combinations. The displayed regular price and discount will also be sourced from a look-up table that stores the regular price and discount for each price inflation level (20% through 70%). The sitewide discount rates will also be based on the rates used most frequently by rugsusa.com during the class period.

103.    While the price information shown to respondents will count as three attributes (web, regular, sitewide discounted prices) in the Sawtooth Software conjoint analysis, the price information will appear seamlessly to respondents as if it were just one feature – price.[48]

104.    The second attribute, **material type**, has been discussed in the context of describing the web price attribute. Material type is a filter for sorting products at rugsusa.com. On February 5, 2025, the material type filter categorized 18,032 products. The counts and column percentages are shown below. I kept the order of the material types in alphabetical order as presented in the filter. The bolded material types are proposed levels for the material type attribute in my conjoint

---

[48] Therefore, from a respondent's perspective, there are only seven features in my conjoint design: Primary Material, Rug Size, Style, Pattern, Color, Descriptions, and Price. Sawtooth will count "Descriptions" as having six attributes and "Price" as having three attributes.

surveys. These four material types comprise 99.8% of all the products sold at the time I captured the information from rugsusa.com.

**Exhibit 10: RugsUSA Inventory by Material Type (as Displayed at RugsUSA.com on Feb. 5, 2026)**

| Material Type | No. of Rugs | Column % |
|---|---|---|
| **COTTON** | 1,035 | 5.7% |
| HEMP | 1 | 0.0% |
| JUTE | 18 | 0.1% |
| **JUTE & SISAL** | 1,581 | 8.8% |
| LEATHER | 14 | 0.1% |
| NATURAL FIBERS | 4 | 0.0% |
| POLYESTER | 5 | 0.0% |
| **SYNTHETICS** | 11,415 | 63.3% |
| **WOOL** | 3,950 | 21.9% |
| TOTAL | 18,023 | 100.0% |

105.    The third attribute, **rug size**, has already been discussed above in the context of conditional pricing. Because I have designed two conjoint surveys, the number of levels in each rug size attribute will be manageable. The small-sized conjoint survey will have these levels:  2x3, 3x5, 4x6, and 5x8 rugs.[49] The large-sized conjoint survey will cover the rugs 6x9, 8x10, 9x12, and 10x14 rugs.[50]

106.    The fourth attribute, **style**, is one of four top-row filters for sorting rugs at rugsusa.com. (The others are size, color, and pattern). Because there are too many styles used by Defendant that can be accommodated by a conjoint survey,[51] I have selected the seven style types

---

[49] Each rug size is well populated with rugs at Defendant's website, with a low of n=1,020 for the 2x3 rugs and a high of 2,656 rugs for the 5x8 rugs. Accessed rugsusa.com on February 5, 2026.

[50] Each rug size is well populated with rugs at Defendant's website, with a low of 1,020 for the 10x14 rugs and a high of 2,135 rugs for the 8x10 rugs. Accessed rugsusa.com on February 5, 2026.

[51] Using an excessively large number of levels in an attribute can cause focalism bias, which results in respondents placing undue importance on an attribute.  Dick R. Wittink et al. review the literature documenting this effect. The authors refer to this pattern as the "levels effect." Researchers repeatedly have "showed that experimental manipulations of the number of attribute levels resulted in systematic differences in estimated attribute importances." (Wittink, *et al.*, p. 2) That is, simply adding levels to an attribute can result in respondents placing more importance on the attribute.  D. Wittink, J. Huber, P. Zandan, R. M. Johnson, 1992, The Number of Levels Effect in Conjoint: Where Does It Come From and Can It Be Eliminated? Sawtooth Software Research Paper Series.

DECLARATION OF J. MICHAEL DENNIS    Case No. 3:25-cv-00454

that have the most inventory (as of February 5, 2026) for inclusion in the surveys, plus an "Other" category. The selected style types are Modern, Transitional, Traditional, Oriental and Persian, Farmhouse, Coastal, and Contemporary. Prior to the choice tasks, when the survey describes each attribute, the survey will show visual images to educate the respondent on the definition of each style type.[52]

107.    The fifth attribute, **pattern**, is also one of the four top-row filters for sorting rugs at rugsusa.com. Prior to the choice tasks, when the survey describes each attribute, the survey will show visual images to educate the respondent on the definition of each pattern type. Similar to my selection of styles, I have selected the style types having the most inventory and then also including an "Other" category: Striped, Vintage & Distressed, Medallion, Geometric, Solid, and Abstract.

108.    The sixth attribute, **color**, is sourced from Defendant's filter sorter, as presented below showing the inventory of rugs by color. I will digitally remove the count information before creating this attribute for the surveys. Before the choice tasks, when the survey describes each attribute, it will display visual images to help the respondent understand the available colors.

---

[52] As discussed later in my expert report, my focus group participants recommended the use of visuals to communicate "Style" and "Pattern" types.

DECLARATION OF J. MICHAEL DENNIS                           Case No. 3:25-cv-00454

**<u>Exhibit 11: List of Colors (Source: rugsusa.com)</u>**[53]



109.    The seventh attribute involves displaying two or four **descriptors** for each product concept. The descriptors are selected from a pool of 12 descriptors. Nine descriptors are used by Defendant to differentiate its products, and three are from suggestions made by my focus group participants. The 12 descriptors are listed below.[54] I will randomly assign the 12 descriptors into one of six groupings (of three descriptors each). For each product concept, the conjoint design will display randomly one or two of the six descriptor groups.[55]

---

[53] This exhibit is from the product filter at rugusa.com. I removed the numbers indicating the number of rugs in inventory.

[54] The first nine descriptors were sourced from rugsusa.com.  The last three were sourced from recommendations made by my focus group participants.

[55] Therefore, each product will display two or four descriptors. Prior to fielding the conjoint survey (if I am in fact asked to conduct the conjoint survey), I will determine whether any prohibitions are needed. For instance, if my research indicated that 5-by-8-feet rugs are not in fact "Machine Washable," I would put in place a prohibition that prevents the "Machine Washable" label from being shown on product concepts with a size of 5 by 8 feet or larger.

**Exhibit 12: Descriptor List**

- Handmade
- High Traffic
- Machine Washable
- Pet-Friendly
- Non-Slip Backing
- Eco-Friendly
- Reversible
- Stain Resistant
- Performance
- Hypoallergenic[56]
- Made in the USA[57]
- GoodWeave Certified[58]

110.    **Other Considered Attributes.** Additional discovery and research (such as feedback from respondents during questionnaire testing and any additional qualitative research) may justify the addition or substitution of one or more attributes. However, my design already includes seven features presented to respondents, which is close to the ceiling of the number of levels advisable for conjoint surveys.[59]

111.    **Choice Task Question Wording.** Each choice task will use the same question wording and instructions. The wording of the choice task question and the respondent instructions are displayed below. In the survey introduction, the survey instructs the respondents to assume the products are all alike except for the features shown in the survey.

---

[56] Recommended by several focus group participants. The "Hypoallergenic" descriptor is used on numerous rugs sold by Target, Wayfair, and Tumble.

[57] Recommended by several focus group participants. The "Made in the USA" label appears on some area rugs sold by Target.

[58] Several focus group participants recommended that a "certification" descriptor be included. Rugs-Direct.com markets some rugs with the "GoodWeave" certification.

[59] Earlier in this expert report, I presented a discussion of the risks to data quality of using an excessive number of attributes.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

**Exhibit 13: Choice Task Question Wording**

---

**If these were your only options, which of these indoor rug products would you choose?**
*Remember that the products are from an online retailer.*

*Also, remember that the features shown are the only ones important to you since the products are alike in all other respects, such as thickness and shape.*

Choose by clicking the button at the bottom of the description for the indoor rugs you prefer.

---

112.   **Dual-Response None Question Format.** After making a choice in a choice task, respondents will be provided a "no buy" option so that respondents will have the opportunity to "walk away" and not make a selection. The "no buy" option will be presented on the same screen and just below the choice task. By providing this "dual-response none" follow-up question, I will provide respondents a market realistic context.[60] The "no buy" option question is shown below (as an illustration that will later be programmed into the conjoint survey):

**Exhibit 14: Proposed Dual-Response None Question**

---

Given your knowledge of the market, would you actually be willing to buy the INDOOR RUG product at the indicated price?
  o  Yes
  o  No

---

113.   **Illustrations of Choice Tasks.** To help the court visualize a choice task for my Conjoint Survey, please see below a mock-up of a potential choice task (using the small-sized conjoint). I created the choice task in Excel. Therefore, the mock-up lacks the polish of a properly programmed choice task for an online survey. The production version of the surveys will include hundreds of different combinations of attributes and levels that make up the choice tasks.

---

[60] *See* https://sawtoothsoftware.com/help/lighthousestudio/manual/hid_web_cbc_none.html. Accessed most recently on 4/23/2023.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

**Exhibit 15: Example of a Choice Task for the Proposed Conjoint Survey**

| | | | |
|---|---|---|---|
| **If these were your only options, which of these INDOOR RUG products would you choose to purchase?** | | | |
| *Remember that the products shown are from an online retailer.* | | | |
| *Remember that the features shown are the only ones important to you since the products are all alike in all other respects.* | | | |
| Choose by clicking the button at the bottom of the product description for the indoor rug you prefer. | | | |
| **Product Feature** | **Rug A** | **Rug B** | **Rug C** |
| Primary Material | Wool | Synthetics | Cotton |
| Rug Size (dimensions in feet) | 3 x 5 | 5 x 8 | 4 x 6 |
| Style | Oriental and Persian | Contemporary | Farmhouse |
| Pattern | Medallion | Abstract | Solid |
| Color | ⬤ Blues | ⬤ Browns | ⬤ Yellows |
| Descriptions | Handmade / Machine Washable | Pet-Friendly / Eco-Friendly | Stain-Resistant / High Traffic / Reversible |
| Price (Not Including Shipping and Tax) | **$719** ~~$899~~ **(20% OFF)** | **$239** | **$179** ~~$299~~ **(40% OFF)** |
| *Select one for purchase* | O | O | O |
| Given your knowledge of the market, would you actually be willing to buy the INDOOR RUG product you selected at the indicated price? | | | |
| ○ Yes | | | |
| ○ No | | | |

114.    **Other Specifications for the Conjoint Survey.** Below are additional specifications for the conjoint survey.

- The choice-based-conjoint design will be based on at least 200 versions (*i.e.*, each version consists of 12 random choice tasks plus two fixed, hold-out tasks, as explained below). Each version will consist of a mix of product alternatives, which in turn will reflect a random mix of attributes and levels.

- Each respondent will be administered 14 choice tasks by being randomly assigned to one of 200 conjoint versions. I will use D-Efficiency design to determine the combinations of specific levels of each attribute for any version of 12 choice tasks.

- In addition to the 12 choice tasks used for estimation of any overpayment caused by the alleged deception, I will also insert two fixed choice tasks called "holdout tasks." "Holdout tasks" refer to choice questions that are deliberately excluded from the main

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

model used to estimate any overpayment statistics in order to perform statistical tests of the reliability of the data provided by respondents.[61]

- The attribute order is fixed for the price attribute, which will be anchored in the bottom position. This is the customary practice in conjoint surveys. The remaining attributes will be randomized, but for each respondent, the order of the attributes will be fixed across all attributes.

115.    **Respondent Instructions for the Conjoint Survey.** Prior to being asked to make choices in the Conjoint Survey, respondents will be shown a series of screens to prepare them for making their product choices, as shown in the Discussion Guide for the Focus Group **(Attachment C)** where I presented the draft survey questionnaire. The first set of screens serve the purpose of establishing a credible hypothetical marketplace where the respondents will be asked to consider various indoor area rug products that are available for purchase online. The instructions will provide complete instructions on how to participate in the study. The instruction screens will include descriptions of each feature and the levels for each attribute. Moreover, the survey will instruct the respondents to assume that all features not shown in the survey are the same across the available products. By following these instructions, respondents will be making their product choices in the conjoint survey based on the features and levels displayed.

116.    **Choice Exercise Tutorial.** Before administering any choice tasks that collect data for estimation, I will give respondents a tutorial on the choice exercise. The purpose of the tutorial is to give respondents an opportunity to become accustomed to the choice task format, the attributes, and the "no buy" response option displayed on the screen. Respondents will be given

---

[61] The data from the holdout tasks are "held out" – that is, they are used to test the main model's accuracy by comparing predicted choices on these holdout tasks with actual respondent choices. By this means, I can examine how well the main model generalizes to the data collected via the holdout tasks (which are, in effect, data that are not informing the main model). A "hit" occurs when the main model successfully predicts the respondent's choice in a holdout task withheld from the prediction. If the prediction fails, then a "miss" has occurred. The hit rate across the survey interviews is the percent of correctly predicted holdout responses using the main model. The hit rate statistics regarding my conjoint survey will help assess the reliability of my conjoint survey, in my expert opinion.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

the opportunity to view an actual choice task and "practice" making a product choice. Since this is a practice exercise, I will not use any data collected from the practice choice task for estimation.

117.    **Conjoint Survey Interview Sample Size.** I expect to collect approximately 400 survey completions for each of my two conjoint surveys.

118.    My planned-for interview sample size exceeds industry guidelines recommending at least 150 respondents for a given segment participating in the conjoint survey and 300 conjoint interviews in total for robust quantitative research, as explained by Bryan Orme from Sawtooth Software.[62] By collecting approximately 400 survey interviews for each conjoint survey, I will be able to analyze the data by consumer subgroups.

119.    **Blinded Research Design.** As a precaution against potential bias, the research objectives and study sponsor will not be disclosed to the survey respondents or to the survey firm recruiting them for my conjoint survey (*i.e.*, a blinded research design).

**SECTION 11: DESCRIPTION OF THE ANALYTIC PLAN**
**FOR ESTIMATING ANY ECONOMIC LOSS**

120.    To calculate any overpayments attributable to the Challenged Conduct, I will conduct a "market simulation" using Sawtooth Software Lighthouse Studio. Sawtooth Software is the industry leader in market research for conjoint data collection and analysis software. Market simulations using conjoint data are a staple in marketing research science. Market simulations are a common deliverable at the conclusion of a choice-based conjoint study. Sawtooth's authors explain that:

> The simulator is used to convert raw conjoint (partworth utility) data into something much more managerially useful: simulated market choices. Products can be introduced within a simulated market scenario and the simulator reports the percentage of respondents projected to choose each product. A market simulator lets an analyst or manager conduct what-if games to investigate issues such as new product design, product positioning, and pricing strategy. Market simulators are commercially

---

[62]    Bryan Orme, 2010, "Sample Size Issues in Conjoint Analysis," available at https://www.sawtoothsoftware.com/download/techpap/samplesz.pdf (last accessed Apr. 27, 2023).

- 43 -

available or can be constructed using spreadsheet programs.[63]

121.    In short, a market simulation tool is a "choice laboratory" for testing multiple real-world possibilities (*e.g.*, the market value of Defendant's Products having an adequate disclosure).

122.    With respect to the analysis tools needed to analyze survey data, the raw data from a conjoint survey is fundamentally different from that from a non-conjoint survey, which typically uses a direct-questioning methodology. In a conventional survey data set, survey answers such as "yes" and "no" are coded as "1" and "2," allowing straightforward counting of survey responses. No "modeling" of the data is required to draw inferences. In contrast, a conjoint study yields a set of utilities or part-worths that quantify the value respondents place on each level of each attribute (*e.g.*, each price level for the "Price" attribute). To draw inferences from the utility data, conjoint analysis leverages Bayesian statistics (technically, Hierarchical Bayesian modeling) to provide individual respondent-level models.[64]

123.    The overpayment statistics will be estimated using part-worth utilities calculated in the most recently issued version of Sawtooth Lighthouse Studio employing Hierarchical Bayesian models. The Sawtooth market simulation to calculate overpayment statistics due to the alleged deception will be based on either the share-of-preference method or the Randomized First Choice method.[65]

124.    My market simulations will provide a statistically robust estimate of any overpayments that class members incurred. I will present the overpayments in the form of fractions of the total prices paid by class members for the Products. For instance, an overpayment of 10% for the Products with the alleged deception that sold for $40 is the same as stating that $4 of the Products' price is attributable to the deception. Put simply, in this example, class members

---

[63] Orme (2020) at p. 89; *see also* Joel Huber and Bryan Orme, "Dealing with Product Similarity in Conjoint Simulations," (1999) Sawtooth Software Research Paper Series, accessed at https://sawtoothsoftware.com/resources/technical-papers/dealing-with-product-similarity-in-conjoint-simulations (last accessed Dec. 22, 2024).

[64] *See* Orme (2014) at Ch. 9, "Interpreting the Results of Conjoint Analysis."

[65] I use both methods to assess convergence of estimates. I will determine which of the two methods (Share of Preference, Randomized First Choice) provides the most conservative price premium estimate, on which I will rely for the calculation of any overpayment statistics. In my experience, the two approaches produce comparable overpayment statistics.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

overpaid by 10%.

125.    I have consulted with Mr. Colin Weir, Plaintiff's expert in economics, in determining the appropriate methodology for calculating the price premium using market simulation. Based in part on my consultation with Mr. Weir, my market simulation recognizes that the actual quantity of Defendant's Products supplied to the proposed classes is fixed as a matter of history. By using the actual prices paid by consumers, as well as the fixed quantity of Products supplied, my conjoint survey and my market simulations will incorporate both demand- and supply-side factors and will reliably estimate the but-for market value of the Products.

126.    My overpayment statistics will be reported in the form of a percentage of the price of the Products. The statistics will represent any overpayments solely attributable to the Challenged Deception.

127.    To calculate the overpayment statistics for each conjoint survey, I will use a market simulation to determine whether and to what extent the market-clearing price for the Products *with* the Challenged Conduct (use of 20% or more false discounting) is higher or lower than the identical Products *with* the "cure" of not displaying the false reference price and false discount. By this means, the market simulation will reliably isolate any economic value associated with the Challenged Conduct since the only difference between the two otherwise identical Products in the market scenario is that one Product has the alleged deception and the other one is "cured."

128.    As mentioned, in calculating the part-worth utilities and conducting the market simulations, I will employ Sawtooth Software Lighthouse Studio.[66] My expert report will include

---

[66] Sawtooth issues white papers documenting the methodology underlying the software that I will employ for calculating the part-worth utilities using Hierarchical Bayes Analysis (HB) (*e.g.*, Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis, Version 9"). As discussed above, the raw data created by a conjoint survey is fundamentally different from non-conjoint survey data obtained through direct questioning. Because a conjoint study results in a set of utilities or part-worths, conjoint analysis leverages Bayesian statistical modeling to provide individual respondent-level models. *See* Orme (2014) at Ch. 9, "Interpreting the Results of Conjoint Analysis." If I am asked to conduct the conjoint survey and analysis, I will document in my expert report the exact estimation settings that I will use in calculating the utilities, including any price constraints or deviations from the default settings in Sawtooth.

my working papers containing the calculations of overpayment statistics. I understand these overpayment statistics will be provided to Mr. Weir for estimation of any economic damages.

129.    My expert report will produce a price premium estimate, as shown in the below "Template for Reporting Price Premium Estimates." As a "Template," this table shell is intentionally not populated with any statistics since the Conjoint survey has not been conducted yet and is provided only for the purpose of documenting the concepts related to the calculation of the overpayment statistics.

**THIS SPACE IS INTENTIONALLY BLANK**

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

**Exhibit 16: Template for Reporting Price Premium Estimates for Each Conjoint Survey**

| | Market Price with Alleged Deception | Market Price in But-For World | Price Premium in Dollars | Price Premium Percent |
|---|---|---|---|---|
| **At-Issue Products (Row for Each False Discount Rate)** | A | B | C | D |

Where "A" =   Estimated market price paid by class members for the at-issue Products when Defendant engaged in the Challenged Conduct[67]

Where "B" =   The market-clearing price for Products in the but-for world with Defendant not displaying false reference pricing and false discounts, whereby the market share is an equal 50/50 split for the Products with and without the Challenged Conduct.

Where "C" =   The price premium in dollars and cents (calculated as A minus B).

Where "D" =   The price premium percent measured as C divided by A.

130.    I will report the price premium statistics for each level of the false discounting rate for each form of Challenged Conduct shown in Exhibit 9.

131.    I will also conduct a variety of sensitivity and quality control tests to assess the reliability of choice data collected from the respondents. These tests will enable me to determine whether there is justification for removing any interviews from the analysis that potentially contain unreliable responses.[68]

132.    For instance, I will examine the Root Likelihood (RLH) scores of respondents as a measure of the consistency of their choices in the conjoint survey. Examining the RLH scores will enable me to identify specific respondents who may have made their choices randomly or nearly

---

[67] The estimated market price can be determined by various means, including but not limited to relying on the price points featured in the conjoint survey or on an estimate of the average price paid by class members via examination of sales transaction data for each product size featured in the conjoint surveys.

[68] My expert report will provide complete and transparent documentation on all collected survey data. I will attach all the raw survey response data for all respondents, regardless of whether their responses are the basis for the calculation of any overpayments made by the proposed classes.

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

randomly. Such inattentive and low-effort respondents could potentially reduce the reliability and accuracy of the overpayment statistics. I will determine whether the removal of the respondents having the lowest RLH scores is warranted for the conjoint analysis, resulting in a more statistically robust model.

133.    I will conduct a similar sensitivity test regarding the time respondents spend answering the survey questions. Potentially, those respondents spending less time answering the survey questions will provide less reliable responses because they were not sufficiently engaged in considering the choice tasks. I will conduct a sensitivity test to determine whether the choices made by the faster-responding respondents are statistically comparable or not to the choices made by other respondents. My expert report will provide complete and transparent documentation on any removals of interviews from the analyses, while attaching all the raw survey data collected by my conjoint survey to provide Defendant with the ability to replicate all analyses.

134.    For the second set of sensitivity tests regarding the reliability of the choice data collected from respondents, I will also conduct "hit rate" analyses to predict individual responses to holdout choice tasks. "Holdout tasks" are choice questions deliberately excluded from the main model used to estimate overpayment statistics. The data from the holdout tasks are "held out" – that is, they are used to test the main model's accuracy by comparing predicted choices on these holdout tasks with actual respondent choices. By this means, I can examine how well the main model generalizes to the data collected via the holdout tasks (which are, in effect, data that do not inform the main model). A "hit" occurs when the main model successfully predicts the respondent's choice in a holdout task withheld from the prediction. If the prediction fails, then a "miss" has occurred. The hit rate across the survey interviews is the percentage of correctly predicted holdout responses using the main model. The hit rate statistics for my conjoint survey will help assess its reliability, in my expert opinion.

135.    I will also examine the data to identify any subgroups of respondents who may have statistically significant differences in the overpayment statistics. Subgroup analyses will identify, for each subgroup, any statistically significant differences in the estimated shares of preference for the Products with and without the alleged deception. I will determine, for instance, whether the

price-premium statistics are statistically equivalent across consumer subgroups. I will also conduct sensitivity tests to evaluate the extent to which, if at all, the price premium statistics are related to subgroup characteristics such as age, gender, educational attainment, Census Region, and urban/rural population density.

136. My sensitivity tests will provide the data needed for me assess whether my conjoint analyses are robust and generalizable to the proposed classes.

The facts and data that I considered for developing my opinions in this report are cited herein and/or listed in my attached list of materials considered. I reserve the right to modify my opinions if I were to be provided with additional information, and to supplement them if necessary to respond to criticisms or objections from the opposing party.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2026.

_____
J. MICHAEL DENNIS, PH. D

## LIST OF ATTACHMENTS

A       Curriculum Vitae of J. Michael Dennis, Ph.D.

B       List of Considered Materials

C       Discussion Guide for the Focus Groups

DECLARATION OF J. MICHAEL DENNIS                    Case No. 3:25-cv-00454

# ATTACHMENT A

**Curriculum Vitae of J. Michael Dennis, Ph.D.**

# CV FOR J. MICHAEL DENNIS PH.D.

274 Redwood Shores Parkway #529
Redwood City, CA 94065
JMDSTAT@gmail.com

Education

| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment

| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2015-2025 | Senior Vice President, NORC |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Selected Awards

- 2025 Recipient of NORC at the University of Chicago's Norman Bradburn Career Achievement Award.

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-2022, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-2020, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.

1

- Google Screenwise Research Panel 2011-2014, Director.  Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179).  Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.
- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.   Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism

Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.

Testimony at Deposition or Trial in Last Four Years

1. March 10, 2022. Expert Deposition. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
2. March 24, 2022. Expert Deposition. Testone et al. v. Barlean's Organic Oils, LLC. U.S. District for the Southern District of California (Case No: 19-cv-0169-JLS-BGS).
3. May 27, 2022. Trial Testimony. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
4. June 17, 2022. Expert Deposition. Hall v. Marriott International, Inc. U.S. District for the Southern District of California (Case No.: 3:19-cv-01715-JLS-AHG).
5. September 9, 2022. Trial Testimony. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
6. September 19, 2022. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York (16 Civ. 8364 (RA) (AJP)).
7. January 24, 2023. Expert Deposition. IN RE: FOLGERS COFFEE MARKETING LITIGATION. U.S. District for the Western District of Missouri (Civil Action No.: 21-2984-MD-C-BP).
8. January 29, 2023. Expert Deposition. Bush et al. v Rust-Oleum Corp., U.S. District for the Northern District of California (Case No. 3:20-cv-03268-LB).
9. April 3, 2023. Expert Deposition. Freeman v. MAM USA Corp., U.S. District for the Northern District of Illinois, Eastern Division (Case No.: 1:20-cv-01834).

2

10. April 6, 2023. Expert Deposition. Barbera v. Olé Mexican Foods Inc., U.S. District for the Central District of California (Case No.: 5:20-cv-02324-JGB (SPx)).

11. April 14, 2023. Expert Deposition. Corbett et al. v. Pharmacare U.S., Inc., U.S. District for the Central District of California (Case No.: 3:21-cv-00137-JES-AHG).

12. April 21, 2023. Expert Deposition. Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Pfizer Inc., U.S. District Court for the Northern District of California (Case No.: 4:20-cv-09077-JSW).

13. May 25, 2023. Expert Deposition. Rusoff v. The Happy Group, Inc., U.S. District Court for the Northern District of California (Case No.: 4:21-cv-08084-YGR).

14. July 14, 2023. Expert Deposition. Miller et al. v. Travel Guard Group, Inc., AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, U.S. District for the Northern District of California (Case No. 3:21-cv-09751-TLT).

15. September 22, 2023. Expert Deposition. Patane et al. v. Nestle Waters North America, Inc., U.S. District Court of Connecticut (Case No. 3:17-CV-01381 (JAM).

16. October 6, 2023. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).

17. October 16, 2023. Expert Deposition. Howard et al. v. Hain Celestial Group, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-527-VC).

18. November 16, 2023. Expert Deposition. Glassman et al. v. Edgewell Personal Care, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-07669-RS).

19. January 11, 2024. Expert Deposition. Iglesias et al. v. For Life Products, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-01147-TSH).

20. March 14, 2024. Expert Deposition. Banks et al. v. R.C. Bigelow, Inc., U.S. District for the Central District of California (Case No. 20-cv-06208 DDP (RAOx)).

21. July 24, 2024. Expert Deposition. Sunderland et al. v. Pharmacare, U.S. and Pharmacare Laboratories PTY LTD., U.S. District Court for the Southern District of California (Case No.: 23cv1318-JES (AHG)).

22. August 2, 2024. Expert Deposition. Favell et al. v. University of Southern California, U.S. District Court for the Central District of California, Western Division (Case No.: 2:23-cv-00846-SPG-MAR).

23. October 14, 2024. Expert Deposition. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).

24. November 13, 2024. Expert Deposition. Wallenstein et al. v. Mondelez International, U.S. District Court for the Northern District of California (Case No.: 3:22-cv-06033).

25. February 5, 2024. Testimony at Trial. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).

26. April 29, 2025. Expert Deposition. Sinatro et al. v. Barilla America, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-03460).

27. May 29, 2025. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).

28. June 18, 2025. Expert Deposition. Zinger et al. v. Bai Brands, LLC., U.S. District Court for the Southern District of New York. Case No. 24-cv-3993.

29. June 25, 2025. Expert Deposition. Swartz et al. Dave's Killer Bread, Inc, U.S. District Court for the Northern District of California (Case No.: 4:21-cv-10053-YGR).

30. July 1, 2025. Expert Deposition. Gershzown et al. v. Colgate-Palmolive Company, U.S. District Court for the Northern District of California (Case No.: 23-cv-04086-JCS).

31. August 26, 2025. Expert Deposition. IN RE: Nestle Boost Nutritional Drink Litigation, U.S. District Court for the Northern District of California (Case No. 4:21-cv-09812-JSC).

32. September 24, 2025. Expert Deposition. Sinatro et al. v. Barilla America, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-03460).

33. December 3, 2025. Expert Deposition. Thomas et al. v. Walmart Inc., U.S. District Court for the Northern District of Illinois (Case No.: 1:23-cv-05315).

34. January 14, 2026. Expert Deposition. Favell et al. v. University of Southern California and 2U, Inc., U.S. District Court for the Central District of California, Western Division (Case No.: 2:23-cv-00846-SPG-MAR).

35. January 28, 2026. Expert Deposition. Axelrod et al. v. Lenovo (United States) Inc., U.S. District Court for the Northern District of California (4:21-cv-06770-JSW-RM).

Attachment

3

Publications

Fulton, B., Bilgen, I., Pineau, V., Liebert, L., King, D., & Dennis, M. 2022. "Evaluating Nonresponse Bias for a Hypernetwork Sample Generated from a Probability-Based Household Panel." Journal of Quantitative Methods, 6(2).

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018.  Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015.  Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly.  78 (4): 889-916.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2011. "Calibrating Non-Probability Internet Samples with Probability Samples Using Early Adopter Characteristics." Joint Statistical Meetings: 4501-4515.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom.  2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions."  Alcoholism: Clinical and Experimental Research  32(2): 1-8.

J. Michael Dennis and Rick Li.  2007.  More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December.  Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack."  Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank,  Richard A. Kulka. 2002.  "Psychological Reactions to Terrorist Attacks:  Findings from the National Study of Americans' Reactions to September 11."  Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?"  Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

4

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis. "Surgeons Under Surveillance: Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

5

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Lindsay Liebert. Nonresponse Follow-up Impact on AmeriSpeak Panel Sample Composition and Representativeness. July 19, 2024. NORC AmeriSpeak Working Paper.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

6

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis. 2017. Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh. 2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality: The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016. Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel. Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo. "Online Survey Sampling Solutions for Studies of LGB." Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III. "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research. Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling? An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

7

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012  "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates."  Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force.  Prepared for the American Association for Public Opinion Research,  March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

8

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias." Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos? Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancouver. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels." Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign." Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

9

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.

Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans.*  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

"The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?" Workshop hosted by the University of Essex, Colchester, UK. Presented the paper "Recommendations for Establishing a National Online Panel in the UK." June 6-7, 2013.

"The Data Collection of the Future Has Already Started." Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona. Presented the paper "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research." July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys." Sponsored by the National Science Foundation and hosted by NORC in Chicago. June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions. December 2009.

"Sample Representativeness: Implications for Administering and Testing Stated Preference Surveys." Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency. Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)

Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010), Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)

11

# ATTACHMENT B

## LIST OF CONSIDERERED MATERIALS

## Attachment B

## List of Considered Materials

PLEASE NOTE: OTHER CITATIONS MAY BE FOUND IN THE MAIN BODY OF MY EXPERT REPORT

Addl MDW Discounts.XLSX

Contemporary _ Modern Area Rugs _ Rugs Direct.pdf

Defendant RUGSUSA's Supplemental Responses to Plaintiff's First Set of Interrogatories

DTC_ELT_Performance_2023-08-13.pptx.pdf

DTC_ELT_Performance_Week_43_2023-10-29.pptx.pdf

Layla Comp_Pricing_24.07.18 (v3).XLSX

Made in USA _ Accent Rugs _ Target.pdf

Rugs for Every Style & Budget_ – Rugs USA homepage 2026.02.05.pdf

RugsUSA_1Q23_BOD_Mtg_Materials_vFinal.pdf

RugsUSA_Competitive_Benchmarking_Research_EP_2309.pdf

RUGSUSA_HONG00000504_Confidential.xlsx

RUGSUSA_HONG00000508_Confidential.xlsx

RUGSUSA_HONG00000941_Confidential.xlsx

RUGSUSA_HONG00000957_Confidential.xlsx

RUGSUSA_HONG00002073_Confidential.xlsx

RUGSUSA_HONG00002475_Confidential.xlsx

RUGSUSA_HONG00002889_Confidential.xlsx

RUGSUSA_HONG00003099_Confidential.xlsx

RUGSUSA_HONG00003961_Confidential.xlsx

RUGSUSA_HONG00005219_Confidential.xlsx

1

RUGSUSA_HONG00005675.pdf

RUGSUSA_HONG00005688-A-CONFIDENTIAL.xlsx

RUGSUSA_HONG00005689-A-CONFIDENTIAL.xlsx

RUGSUSA_HONG00005691_Confidential

RUGSUSA_HONG00005691_Confidential.xlsx

RUGSUSA_HONG00005691_Confidential.zip

RUGSUSA_HONG00005692_Confidential.xlsx

RUGSUSA_HONG00005693_Confidential.xlsx

RUGSUSA_HONG00005694_Confidential.xlsx

RUGSUSA_HONG00005695_Confidential.xlsx

RUGSUSA_HONG00005696-CONFIDENTIAL.xlsx


**Survey Literature**

"Cognitive Interviewing", Center for Disease Control, accessed at https://www.cdc.gov/nchs/ccqder/question-evaluation/cognitive-interviewing.html (last accessed Dec. 20, 2024).

"The CBC System for Choice-Based Conjoint Analysis", August 2017, Sawtooth Software Technical Paper Series, accessed at https://content.sawtoothsoftware.com/assets/0891a76f-93d3-4838-a38d-8ac0a2cda519 (last accessed Dec. 20, 2024).

"None Option/Dual-Response None", Sawtooth Software, Lighthouse Studio, accessed at https://sawtoothsoftware.com/help/lighthouse-studio/manual/cbc-none-option.html (last accessed Dec. 22, 2024).

Bryan Orme, "Sample Size Issues for Conjoint Analysis", Sawtooth Software, accessed at https://www.sawtoothsoftware.com/download/techpap/samplesz.pdf (last accessed Dec. 20, 2024).

Bryan Orme, "Market Simulators for Conjoint Analysis," Sawtooth Software, accessed at https://content.sawtoothsoftware.com/assets/94da3377-3f7b-49fc-afaf-a65953763d25 (last accessed Dec. 22, 2024).

Joel Huber and Bryan Orme, "Dealing with Product Similarity in Conjoint Simulations," (1999) Sawtooth Software Research Paper Series, accessed at https://sawtoothsoftware.com/resources/technical-papers/dealing-with-product-similarity-in-conjoint-simulations (last accessed Dec. 22, 2024).

2

Shari Seidman Diamond, "Reference Guide on Survey Research", Northwestern University, accessed at https://wwws.law.northwestern.edu/faculty/fulltime/diamond/papers/referenceguidesurveyresearch.pdf (last accessed Dec. 20, 2024).

Rajeev Kohli, *et al.*, (Aug. 3, 2006) "Integrating Conjoint Analysis and Engineering Design", Columbia Business School, accessed at https://business.columbia.edu/sites/default/files-efs/pubfiles/2278/kohli_wadhwa_and_christian.pdf (last accessed Dec. 20, 2024).

Gordon B. Willis and Anthony R. Artino, Jr. "What Do Our Respondents Think We're Asking? Using Cognitive Interviewing to Improve Medical Education Surveys." J Grad Med Educ. 2013 Sep; 5(3): 353–56, accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3771159/ (last accessed Dec. 20, 2024).

F. Reed Johnson, Ph.D., and Mo Zhou, M.A., (2016) "Patient Preferences in Regulatory Benefit-Risk Assessments: A US Perspective", Value in Health, accessed at https://www.valueinhealthjournal.com/article/S1098-3015(16)30431-4/fulltext?_ (last accessed Dec. 20, 2024).

Charles E. Cunningham, *et al.*, "Adaptive Choice-Based Conjoint Analysis: A New Patient-Centered Approach to the Assessment of Health Service Preferences", The Patient: Patient-Centered Outcomes Research, accessed at https://link.springer.com/article/10.2165/11537870-000000000-00000 (last accessed Dec. 20, 2024).

Wann Yih Wu, *et al.*, "Applying Conjoint Analysis to Evaluate Consumer Preferences toward Subcompact Cars," Expert Systems with Applications 41 (2014): 2782-2792.

Green, P., Srinivasan, V. (1978) "Conjoint Analysis in Consumer Research: Issues and Outlook", *Journal of Consumer Research* (Oxford).

Green, P., Srinivasan, V. (1990) "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," *Conjoint Analysis in Marketing* (American Marketing Association).

Wittink, D., Cattin, P. (1989) "Commercial Use of Conjoint Analysis: An Update", *Journal of Marketing* 53 (July): 91-96.

Ofek, E., Toubia, O. (2014) "Conjoint Analysis: A Do It Yourself Guide", *Harvard Business Review* (Aug)

Gordon B. Willis (2005) *Cognitive Interviewing: A Tool for Improving Questionnaire Design*, (Sage Publications Ltd.).

Grove, R. (2011) *Survey Methodology*, Second Edition (Wiley).

Marsen, P., Wright, J., (2010) *Handbook of Survey Research*, Second Edition (Emerald).

Bradburn, N. (2004) *Asking Questions*, Second Edition (Jossey-Bass).

3

Orme, B. (2020) *Getting Started with Conjoint Analysis*, Fourth Edition (Research Publishers LLC).

Orme, B. (2014) *Getting Started with Conjoint Analysis: Strategies for Product Design & Pricing Research*, Third Edition, (Research Publishers LLC).

Orme, B. (2010) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Second Edition (Research Publishers LLC).

Tourangeau, R., Rips, L., Rasinski, K. (2000) *The Psychology of Survey Response,* (Cambridge Univ. Press).

Bernheim, B., Whinston, M. (2008) *Microeconomics* (McGraw-Hill Irwin).

Orme, B., Chrzan, K. (2017) *Becoming an Expert in Conjoint Analysis* (Sawtooth Software, Inc.).

Allen, M., Hall., R., and Lazear, V. (2011) *"Reference Guide on Estimation of Economic Damages,"* Reference Manual on Scientific Evidence (National Academies Press).

Diamond, S. (2011) *"Reference Guide on Survey Research,"* Reference Manual on Scientific Evidence (National Academies Press).

# ATTACHMENT C

## DISCUSSION GUIDE

## FOR THE FOCUS GROUPS

# ATTACHMENT C

# DISCUSSION GUIDE FOR THE FOCUS GROUPS

# Ground Rules for Today

- Cameras on, unless I have given you permission already for the camera to be off

- Mute your microphone until called on to speak

- I will show you the survey, and then there will be a discussion period where I will ask you questions and get your feedback

- That's it!!!

For this survey, we will ask you to consider for purchase several different **<u>INDOOR AREA RUG</u>** products.

These products are **NOT**:
Wall-to-Wall Carpets
Outdoor Rugs

The **INDOOR AREA RUG** products come in various sizes, styles, colors, and are made of various materials..

The **INDOOR AREA RUG** products in this survey are available through online retailers.

If you were to buy such an INDOOR AREA RUG product, it would be shipped to you.

4

The survey will show you **INDOOR AREA RUG** products with different features and prices.

- You will have 12 chances to make a choice about the **INDOOR AREA RUG** products you would purchase in real life.   For each choice, you will select from three **INDOOR AREA RUG** products.

- Right after you make a choice, the survey will ask you a second question.  You will be asked whether you would actually be willing to purchase the product at the price shown in the survey.  Please base your answer on your knowledge of the market.

In making your choices, please make these assumptions:

- Any **INDOOR AREA RUG** product features <u>not shown</u> in the survey are the same for all three **INDOOR AREA RUG** products. Assume the products are the same (such as shape and thickness), except for the differences in features and prices shown in the survey.

- Each **INDOOR AREA RUG** product is available through an online retailer.

- The prices for the **INDOOR AREA RUG** products do NOT include any tax or shipping costs.  Please assume that all the products have the same shipping costs and tax rates.

The survey will show **INDOOR AREA RUGS** that include one or more features within each of the following categories:

- Size of Area Rug
- Primary Material
- Style
- Pattern
- Color
- Descriptions on the Online Ad
- Price (Not Including Shipping or Tax)

In addition to these features, please assume that all other features will be the same across the **INDOOR AREA RUGS**.

We will now introduce you to the features that will vary in the **INDOOR AREA RUGS.**

## SIZE OF AREA RUG

The **INDOOR AREA RUG** products will come in various sizes.

The smallest area rugs will be 2 feet wide by 3 feet long (2 x 3).

The largest area rugs will be 10 feet wide by 14 feet long (10 x 14).

There will be rugs that are in between the smallest and largest rugs.

## PRIMARY MATERIAL

Each **INDOOR AREA RUG** product will be made out of
one of these PRIMARY MATERIALS.

- Synthetics
- Wool
- Jute and Sisal
- Cotton

**STYLE**

Each **INDOOR AREA RUG** product will be in one of these STYLES.

- Modern

- Transitional

- Traditional

- Oriental and Persian

- Farmhouse

- Coastal

- Contemporary

## PATTERN

Each **INDOOR AREA RUG** product will be in one of these PATTERNS.

- Striped

- Vintage & Distressed

- Medallion

- Geometric

- Solid

- Abstract

## COLOR

Each **INDOOR AREA RUG** product will be in one of these
family of color.



| | |
|---|---|
| Ivories | Tans |
| Whites | Blacks |
| Greys | Browns |
| Blues | Greens |
| Reds | Multicolored |
| Pinks | Oranges |
| Yellows | Golds |

12

## DESCRIPTION ON THE WEB ADVERTISEMENT

Each **INDOOR AREA RUG** product show <u>up to three</u> descriptions that are on the product's online ad.

The descriptions will come from this list:

- Handmade
- High Traffic
- Machine Washable
- Pet-Friendly
- Non-Slip Backing
- Eco-Friendly
- Reversible
- Stain Resistant
- Performance

13

## PRICE (NOT INCLUDING SHIPPING OR TAX)

Each **INDOOR AREA RUG** product will show the PRICE, not including and shipping costs or tax).

On the next screens, there will be three **INDOOR AREA RUGS** for you to choose from.

15

**If these were your only options, which of these INDOOR RUG products would you choose to purchase?**

*Remember that the products shown are from an online retailer.*

*Remember that the features shown are the only ones important to you since the products are all alike in all other respects.*

Choose by clicking the button at the bottom of the product description for the indoor rug you prefer.

| Product Feature | Rug A | Rug B | Rug C |
|---|---|---|---|
| Primary Material | Wool | Synthetics | Cotton |
| Rug Size (dimensions in feet) | 3 x 5 | 5 x 8 | 4 x 6 |
| Style | Oriental and Persian | Contemporary | Farmhouse |
| Pattern | Medallion | Abstract | Solid |
| Color | Blues | Browns | Yellows |
| Descriptions | Handmade / Machine Washable | Pet-Friendly / Eco-Friendly | Stain-Resistant / High Traffic / Reversible |
| Price (Not Including Shipping and Tax) | **$719** ~~$899~~ **(20% OFF)** | **$239** | **$179** ~~$299~~ **(40% OFF)** |
| *Select one for purchase* | O | O | O |

16

# DEBRIEFING QUESTIONS

# Were the survey questions clearly written?

# Were the choices in the survey realistic?

Did you answer the survey questions like you would when considering an actual INDOOR AREA PRODUCT for purchase?

Did you answer the survey questions like you would when considering an actual INDOOR RUG product  for purchase?

How do you initially go about thinking about which rugs you are going to consider for purchase? What is the initial way that you group the rugs for comparison? Is it by:

-Rug Size

-Style

-Pattern

-Price

-Something else?

22

# Were there any other features that should have been in the survey?

# Were the price points in the choices sensible and make sense to you?

Did the survey give you the information you needed for you to give a complete response?

# Are there any features you need to know more about to make your choices?

The survey made all the products available to you through a single retailer's website.  Did this make sense to you?

The survey asked you to assume that the products are the same except for the features shown in the survey.

Did this make sense to you?

Would your choices have been different if the survey had shown more features or were you able to make the assumption?

# Were the survey questions leading or biased in any way?

# Was the survey trying to get you to answer the survey questions in a certain way?

Were there were any words or concepts in the survey that you thought were vague?

Any words that needed more explanation?

Was there anything about the survey that was confusing to you?

Were the survey questions presented in a format that made it easy or hard for you to answer?

# Which kind of company or organization do you think is paying me to do this survey?

# THANK YOU!!!